Sullivan
No. 90-281

## The State of New Hampshire

v.

## Fred Chapman

March 20, 1992

*John P. Arnold*, attorney general (*Mark S. Zuckerman*, assistant attorney general, on the brief, and *David S. Peck*, senior assistant attorney general, orally), for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief and orally, for the defendant.

THAYER, J. The defendant appeals the Superior Court's (*McGuire*, J.) denial of his motion to suppress certain evidence, arguing that the evidence was obtained in violation of the holding in *Miranda v. Arizona*, 384 U.S. 436 (1966), and both the State and Federal Constitutions. The evidence was introduced at trial, and the jury convicted the defendant of two counts of aggravated felonious sexual assault, RSA 632-A:2, and one count of second degree assault, RSA 632-A:4. The court sentenced the defendant to concurrent terms of seven-and-one-half to fifteen years for each sexual assault offense, and a concurrent term of three-and-one-half to seven years for the second degree assault offense. For the reasons stated below, we affirm.

In 1988, the defendant and the victim met and began dating. In the summer of 1988, their relationship progressed to the point where they decided to live together. Their cohabitation continued until June of 1989, when the defendant was incarcerated at the Grafton County House of Correction for an unrelated offense. While the defendant was incarcerated, the victim decided to terminate the relationship, moved out of the apartment she had been sharing with the defendant, and began living with another man, Walter Simpson.

On October 7, 1989, the defendant was released from the house of correction. Thereafter, he attempted to rekindle the relationship with the victim and tried to induce her to leave Simpson, but to no avail. At one point, the defendant threatened the victim and her child, and on another occasion a fistfight occurred between the defendant and Simpson.

On the morning of October 18, 1989, the defendant flagged down the victim's car as she was driving to work in Sunapee. Once he had succeeded in stopping the car, the defendant entered the vehicle and "put his hand on" a knife that was on the console of the car. He told the victim that he wanted to talk with her and directed her to pull off to the side of the road bordered by a wooded area. There they discussed the defendant's problems with alcohol, his anger at his ex-wife, and the disposition of their property. Eventually, the defendant decided that he wanted to carve their initials in a tree. He took the knife from the car, grabbed the victim by the arm, and pulled her into the woods. As the victim struggled to free herself, the defendant beat her and threw her to the ground. He continued to beat her and eventually sexually assaulted her. Afterwards, the defendant told the victim not to report the incident until noon and then forced her to drive him to a store in Sunapee. After dropping him off, she then drove home, and the police were called. Sergeant Murphy, of the Sunapee Police Department, responded to the victim's complaint. Sergeant Murphy observed that she had been injured, investigated the crime scene, and prepared a warrant for the defendant's arrest.

At approximately 5:00 p.m. that same day, the defendant turned himself in at the Newport police station where he was placed under arrest. According to the defendant, he consumed a considerable amount of beer prior to his arrival at the police station, and several police officers who spoke with the defendant on the night of his arrest noticed the smell of alcohol on his breath. Two hours later, at approximately 7:00 that evening, Sergeant Murphy arrived at the Newport police station for the purpose of interviewing the defendant. Sergeant Murphy also noticed the smell of alcohol on the defendant's breath, but determined that he was sober enough to discuss the events of that day. Officer Brown of the Newport Police Department and State Trooper Hurley were also present during the course of the interview, but Sergeant Murphy was solely responsible for questioning the defendant. The interview was videotaped with the knowledge and permission of the defendant. Sergeant Murphy began by reading the defendant his *Miranda* rights line by line and, after reading each right, asked the defendant to indicate orally

whether he understood that right. On each occasion, the defendant indicated to Sergeant Murphy that he understood the right that was read to him. The defendant then signed a consent form showing that he understood his rights and agreed to talk with the officers.

During the first two hours of the interview, the defendant denied either raping or assaulting the victim. However, after Sergeant Murphy terminated the interview and turned off the video camera, the defendant admitted that he had been lying and then confessed that he had assaulted the victim. Sergeant Murphy turned the video camera back on and continued the interview. This time on tape, the defendant again admitted to striking the victim in the woods. He also admitted to touching her in a sexual manner. He continued, however, to deny that he raped her or that he had a knife with him. Sergeant Murphy concluded the interview at approximately 9:30 p.m. At approximately midnight, a blood sample was taken from the defendant. Chemical analysis revealed that his blood alcohol content was .13 percent at that time.

Prior to trial, in a motion to suppress, the defendant challenged the admissibility of his statement to the police, arguing that it was the product of a violation of his *Miranda* rights. Additionally, the defendant argued that his intoxication at the time of the interview, the length of the interview, the failure of the police to reveal the charges against him when they first advised him of his rights, and the failure of the police to scrupulously honor his attempts to terminate the questioning, compelled a finding that his confession was involuntary and therefore obtained in violation of his constitutional rights. After a lengthy evidentiary hearing, the trial court denied the defendant's motion to suppress his statement.

At trial, the defendant stipulated that he was guilty of second degree assault. In its case-in-chief, the State introduced the videotape of the conversation between the defendant and Sergeant Murphy. The defendant objected to this evidence based on the grounds he had raised earlier at the suppression hearing. The judge overruled the defendant's objection, and the jury viewed the videotape in its entirety. Although the defendant stipulated before trial that he was guilty of second degree assault, he testified about, and offered an exculpatory version of, the events that occurred on the morning of October 18, 1989. The jury returned a verdict against the defendant.

On appeal, the defendant raises essentially two arguments. First, he maintains that during the interview with Sergeant Murphy, he twice asserted his right to remain silent, but that the police violated this right by failing to terminate the questioning or clarify whether

the defendant's statements indicated a desire to stop the questioning. Accordingly, defendant argues, his subsequent statements were obtained in violation of his *Miranda* rights and must therefore be suppressed. Second, the defendant contends that the State failed to prove beyond a reasonable doubt that his confession was voluntary. Thus, according to the defendant's argument, the trial court committed reversible error in permitting his statements to be introduced into evidence.

■■ The first issue we will address is whether the trial court erred in finding that the defendant did not assert his rights under *Miranda* to terminate questioning and remain silent during his interview with Sergeant Murphy. The defendant raises this argument under both the fifth amendment of the United States Constitution and part I, article 15 of our State Constitution. Therefore, we will address the defendant's claim under the State Constitution first and look to the decisions of the federal courts only for guidance. *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350 (1983). In New Hampshire, the State must establish beyond a reasonable doubt that it did not violate the defendant's constitutional rights under *Miranda* before the defendant's confession may be admitted as evidence. *State v. Zurita*, 133 N.H. 719, 724, 584 A.2d 758, 761 (1990); *State v. Gullick*, 118 N.H. 912, 915, 396 A.2d 554, 555 (1978); *State v. Phinney*, 117 N.H. 145, 146, 370 A.2d 1153, 1153 (1977). On appeal, in reviewing the trial court's finding that the State met its burden, we view the evidence in the light most favorable to the State. *See Zurita*, 133 N.H. at 724, 584 A.2d at 762; *State v. Bushey*, 122 N.H. 995, 999, 453 A.2d 1265, 1267 (1982).

■ The defendant does not argue that his initial waiver of his rights under *Miranda* was involuntary. The defendant, instead, relies upon that portion of the *Miranda* decision which mandates that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," *Miranda*, 384 U.S. at 473–74. In order to determine whether, after initially waiving his constitutional rights under *Miranda*, the defendant subsequently invoked his right to remain silent, we examine the defendant's statements by considering the totality of the circumstances. *See United States v. D'Antoni*, 856 F.2d 975, 981 (7th Cir. 1988) (in determining whether defendant invoked right to remain silent defendant's statements must be viewed within the context of the entire conversation); *see also Zurita*, 133 N.H. at 724, 584 A.2d at 762 (in deciding whether defendant know-

ingly and intelligently waived *Miranda* rights, court properly looked at the totality of the circumstances); *Bushey*, 122 N.H. at 999, 453 A.2d at 1267 (whether defendant made knowing and intelligent waiver of *Miranda* rights must be decided by considering the totality of the circumstances).

The defendant maintains that he twice asserted his right to remain silent during the following exchange with Sergeant Murphy, which occurred during the early part of the interview, but after the defendant had been read and waived his *Miranda* rights:

Defendant: I just don't understand the whole mess because I'm catching [b.s.] even when I'm sitting in jail.

Murphy: O.K., Fred, you want to know what you're getting charged with?

Defendant: Yes, please.

Murphy: O.K., here we go Fred, your [sic] being charged with, kidnapping, aggravated felonious sexual assault, which is rape, and ah, assault.

Defendant: I'm getting charged with all that [b.s.]?

Murphy: Um hum.

Defendant: You've got to be joking.

Murphy: Nope, no joke. So why don't we try this story again. Tell me what really happened.

Defendant: I just told you the bare facts.

Murphy: Well, give me some more of the facts then. You can give me the bare ones, give me the details.

Defendant: *There is nothing else to tell you.*

Murphy: Um hum, well Fred you walked in here today knowing you were going to be arrested didn't you? Why was that?

Defendant: I knew goddam well she was going to put the blame onto me.

Murphy: Why?

Defendant: So didn't, my ex-wife did the same thing.

Murphy: That happens to you a lot does it?

Defendant: Can I tell you something?

Murphy: Sure.

. . . .

Defendant: What I just told you and this man here and this one over here is the [G]od's honest truth. *I need not say no more. Cause I told you all there was to tell you.*

Murphy: O.K.

Defendant: What do you want me to do, lie to you.

Murphy: I don't want you to lie to me Fred, I want to hear the truth. But I don't think you're telling me the truth.

Defendant: I just gave it to you.

Murphy: Well, it doesn't make sense. Why would she accuse you of all these . .

Defendant: That's right, it doesn't make sense. Why did she play . .

Murphy: No, no, your story doesn't make sense Fred. Why would she accuse you of all these, these things?

Defendant: Why would she play on me for four months and then when it was time for me to get out and she'd be gone?

(Emphasis added.) The defendant argues that after he uttered the statements at issue, Sergeant Murphy was obligated to either stop the interview or clarify whether the defendant wanted to terminate the questioning. *See Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975) (defendant's right to cut off questioning must be scrupulously honored).

■ The first statement alleged by the defendant to be an assertion of his right to terminate the interview was: "There is nothing else to tell you." The context in which the defendant uttered this statement indicates that the defendant was professing his innocence by emphasizing his earlier statements, rather than attempting to terminate the interview. In the conversation that immediately preceded his statement, the defendant was expressing disbelief at the charges raised against him, and professing his innocence to Sergeant Murphy by claiming that he had already given the "bare facts." Sergeant Murphy responded by asking the defendant to give more details. In this context, the defendant's reply, "[t]here is nothing else to tell you," is an attempt to persuade Sergeant Murphy to believe his

version of the events that occurred earlier that day. The defendant was not invoking his right to remain silent, but was making an argument of innocence. *See Gandia v. Hoke*, 648 F. Supp. 1425, 1431 (E.D.N.Y. 1986) (defendant's statement, "I have nothing to do with anything else," construed as a statement protesting his innocence).

■ The second instance in which the defendant claims that he invoked his right to remain silent occurred in the following passage taken from the transcript of his videotaped confession.

Defendant: What I just told you and this man here and this one over here is the [G]od's honest truth. *I need not say no more. Cause I told you all there was to tell you.*

Murphy: O.K.

Defendant: What do you want me to do, lie to you.

Murphy: I don't want you to lie to me Fred, I want to hear the truth. But I don't think you're telling me the truth.

Defendant: I just gave it to you.

(Emphasis added.) The transcript, however, is somewhat misleading. Our review of the videotape reveals that the "O.K." from Sergeant Murphy was interjected into a monologue by the defendant, much like someone nodding his head while listening to someone else speak. Additionally, there is no discernible pause, other than a normal intake of breath between sentences, before the defendant continues by saying, "What do you want me to do, lie to you." Thus, from our review of the videotape, we conclude that the statement in question is best viewed as part of a continuous statement as follows:

What I just told you and this man here and this one over here is the God's honest truth. I need not say no more, cause I told you all there was to tell you. What do you want me to do, lie to you?

Thus, the statements which the defendant contends were an invocation of his right to terminate questioning were part of a larger statement in which he was arguing that he was telling the truth, all the truth, and that to say anything else would be a lie. When the defendant told Sergeant Murphy "I need not say no more," he was merely attempting to verify the import of his immediately preceding statement: "What I just told you and this man here and this one over here is the God's honest truth." As in his earlier statement, the defendant

was again attempting to convince his listeners that the only accurate version of that day's events was the version he had just related to Sergeant Murphy. Moreover, the defendant's statement ends with a question to Sergeant Murphy. In response, Sergeant Murphy agreed that he did not want to hear a lie, but only the truth. On these facts, we cannot find that the trial court was clearly erroneous in finding that these statements were not an invocation of the right to remain silent.

The videotape of the interview of the defendant amply supports our conclusion that the defendant was not invoking his right to remain silent, but was merely professing his innocence. On neither of the occasions that the defendant now claims he was invoking his right to remain silent did the defendant make any movement or gesture that might indicate he wished to terminate the interview. Indeed, the defendant's conduct, mannerisms, and tone of voice all tend to indicate that he was trying to convince Sergeant Murphy and the other officers in the room that he was telling the truth. We conclude that Sergeant Murphy acted properly in responding to the defendant's statements. Because we conclude that neither statement made by the defendant constituted even an equivocal assertion of his right to remain silent, we need not consider whether Sergeant Murphy should have asked a clarifying question. At the hearing on the defendant's motion to suppress, the trial court heard three days of testimony and viewed the videotape. The court found beyond a reasonable doubt that the defendant knowingly, intelligently, and voluntarily waived his rights under *Miranda* and stated that "[n]othing in the context of the remark[s] made by the defendant, nor in his conduct, gives any indication that he wished to terminate the interview." We find no error in the trial court's finding.

We now address the defendant's second argument, that the State failed to prove that his confession was given voluntarily. Under our State Constitution, the State must meet this burden by proof beyond a reasonable doubt. *See State v. Sullivan,* 130 N.H. 64, 68, 534 A.2d 384, 386 (1987); *State v. Phinney,* 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977) (explicitly rejecting United States Supreme Court's "preponderance of the evidence" standard for determining voluntariness of confessions and adopting a proof beyond a reasonable doubt standard). Accordingly, we will analyze this portion of the defendant's appeal under the New Hampshire Constitution and will consider federal cases only to the extent that we find them instructive.

■■ "A determination of the voluntariness of a confession is a question of fact for the trial court to decide . . . ." *State v. McDermott*, 131 N.H. 495, 500, 554 A.2d 1302, 1305 (1989) (citing *State v. Wood*, 128 N.H. 739, 742, 519 A.2d 277, 279 (1986)). Such a finding is entitled to stand unless it is contrary to the manifest weight of evidence, as viewed in the light most favorable to the State. *State v. Lewis*, 129 N.H. 787, 791, 533 A.2d 358, 361 (1987). Under the State Constitution, the question we must ask is whether the confession was the "'product of an essentially free and unconstrained choice' and was not 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *State v. McDermott supra* (quoting *State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983)). In reaching its finding, the trial court was obligated to consider the totality of the surrounding circumstances. *See State v. Damiano*, 124 N.H. 742, 747, 474 A.2d 1045, 1048 (1984). The trial court considered the defendant's behavior, demeanor, speech pattern, and level of intoxication on the night of his arrest as indicated on the videotape and compared it to the defendant's demeanor and speech pattern at the suppression hearing. Additionally, the court considered the substance of the defendant's testimony at the suppression hearing, the testimony of the other witnesses at that hearing, as well as the officers' conduct during the interview on tape, before concluding that the State had proved beyond a reasonable doubt that the defendant's statements were voluntary.

On appeal, the defendant challenges several aspects of the trial court's decision. First, he maintains that the trial court failed to consider the "threats" made by Sergeant Murphy that the defendant "could go to jail for a long time." Second, the defendant asserts that the trial court did not accurately assess how his level of intoxication, the length of his interview, and the persistence of the police affected the voluntariness of his statements. We disagree.

■ In its order denying the defendant's motion to suppress, the trial court explicitly found that the police "did not use or threaten to use physical force or deprivation," and that the defendant "did not appear to be intimidated in any way by the officers." We find these conclusions to be supported by the evidence. Sergeant Murphy's comment that the defendant "could go to jail for a long, long time" was an effort to convince the defendant of the seriousness of the charges against him. This type of discussion concerning the potential penalties facing a defendant is not inherently coercive and does not

render a confession involuntary. *See United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir. 1978). In light of the defendant's assertion that he was not frightened by the prospect of returning to prison, we cannot now accept the defendant's argument that Sergeant Murphy's comments were implicit threats designed to scare the defendant into confessing.

The defendant also contends that as a result of our holding in *State v. Goddard,* 122 N.H. 471, 446 A.2d 456 (1982), some weight must be given to a declarant's state of inebriation in order to determine the voluntariness of his confession. In *Goddard,* the defendant argued that he was unable to make a voluntary confession or to voluntarily and knowingly waive his *Miranda* rights because he was suffering from *delirium tremens* due to withdrawal from alcohol and drugs. Our holding in *Goddard,* however, was limited to the issue of the voluntariness of the defendant's waiver of his *Miranda* rights. In light of the overwhelming evidence that the defendant was experiencing *delirium tremens,* we concluded "that a reasonable doubt existed as to the defendant's ability to *voluntarily waive his rights* and confess." *Id.* at 473, 446 A.2d at 457 (emphasis added). Therefore, we find that our holding in *Goddard* does not control our consideration of the issue whether the defendant's state of intoxication undermined the voluntariness of his confession.

As the defendant acknowledges in his brief, "an inquiry into a confessor's mental condition can never be dispositive in applying the constitutional concept of voluntariness." *In re Sanborn,* 130 N.H. 430, 439, 545 A.2d 726, 732 (1988) (citing *Colorado v. Connelly,* 479 U.S 157, 165 (1986)). In *Sanborn,* we further explained that:

> "[F]or in the absence of some overreaching official conduct that produces the confession, there is no State action and, consequently, no violation of the fourteenth amendment. Unless, then, the official conduct is coercive . . . [or deceptive] when considered in relation to the confessor's mental condition and capacity, and unless the coercion or deception induces the confession by overbearing or circumventing the confessor's will, there are no grounds to treat the confession as anything but voluntary for fourteenth amendment purposes."

*Id.* at 439–40, 545 A.2d at 732 (citation omitted).

Although *Sanborn* was decided exclusively with reference to the Federal Constitution, we are persuaded by its analysis and therefore conclude that "[a]lthough proof of a deranged or deficient

mental state may be highly significant in determining whether any given police conduct was overbearing in its effect," *id.*, mere proof that a defendant's confession or admission was the product of his own mental condition is not a sufficient basis to exclude the confession or admission from evidence at trial. Here, there simply was nothing coercive, deceptive, or overbearing in the police's conduct. The videotape shows that the police did not take advantage of an intoxicated defendant. They did not obtain the confession by making direct or implied promises or by exerting influence. *See State v. McDermott*, 131 N.H. 495, 500, 554 A.2d 1302, 1305–06 (1989) (confession obtained by officer's promise of confidentiality held involuntary under due process clause of our State Constitution). The length of the interview was not inordinate or oppressive, *cf. Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (seven-and-one-half-hour interrogation of a defendant with an I.Q. of 89 did not render confession involuntary), nor was its tenor hostile. Throughout the two-and-one-half-hour interview, the defendant was allowed to speak freely, stand and walk about the room, smoke at will, and use the facilities. The police met the defendant's every request. Although the interview may have been strenuous for both the defendant and Sergeant Murphy, nothing in the record suggests that the conduct of the police breached the defendant's constitutional rights.

In sum, based on our review of the totality of the circumstances, construed in the light most favorable to the State, we cannot say that the trial court's finding was contrary to the manifest weight of the evidence. Accordingly, we affirm the trial court's ruling.

*Affirmed.*

All concurred.