Rockingham
No. 98-749

THE STATE OF NEW HAMPSHIRE

v.

ERIC JELENIEWSKI

Argued: January 15, 2002
Opinion Issued: February 25, 2002

*Philip T. McLaughlin*, attorney general (*Kelly A. Ayotte*, senior assistant attorney general, on the brief and orally), for the State.

*Swope & Nicolosi, P.L.L.C.*, of Concord (*Gregory W. Swope* on the brief and orally), for the defendant.

DALIANIS, J. The defendant, Eric Jeleniewski, appeals his first degree murder conviction. RSA 630:1-a, I (a) (1996). He argues that the Superior Court (*Gray*, J.) erred by: (1) denying his motion to suppress statements he made to the police; and (2) denying his motion for recusal. We affirm.

The relevant facts follow. Kimberly Farrah was murdered on September 13, 1997, in Salem. On September 15, 1997, the Salem Police Department presented an arrest warrant along with a sworn complaint to the Salem District Court charging the defendant with hindering apprehension. Having found probable cause, the court signed the complaint and issued an arrest warrant.

On September 15, 1997, the defendant was arrested in Michigan and interviewed by Salem Detective Kevin Swift. The defendant was advised of and waived his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Throughout the interview, the defendant denied involvement in the crime, stating that although he was with Kimberly Farrah on the day of her death, she was fine when he left her. Detective Swift did not believe the defendant and continued to ask him questions. After a series of questions regarding the truthfulness of the defendant's statements, Detective Swift inquired, "And you've got nothing else to say?" to which the defendant responded, "No, sir." Following this exchange, the defendant continued to answer Detective Swift's questions. Later, toward the end of the interview, the defendant was asked, "Okay, is there anything else you want to tell me?" to which he responded, "No, sir."

On September 16, 1997, an extradition hearing was conducted in Michigan, at which the defendant was charged with hindering apprehension on a fugitive warrant. During the hearing, the judge

explained the extradition process to the defendant and inquired whether he wanted an attorney for the extradition hearing. The defendant responded, "Well, yeah, I guess so."

Following the hearing, Salem Detective Paul Marchand, believing the defendant was confused, asked him if he understood what the judge had said. Detective Marchand testified that the defendant responded that "he thought the judge made it sound that he had to stay in Michigan in order to obtain a lawyer, that if he went back to New Hampshire, he couldn't get a lawyer." Detective Marchand advised him, however, that if he returned to New Hampshire and wanted a lawyer, he could hire one or one would be appointed for him. The defendant waived extradition and was transported to a Michigan jail. On September 17, 1997, Detectives Swift and Marchand went to the jail to interview the defendant about the murder. The defendant agreed to speak to the detectives and waived his *Miranda* rights. The State filed the hindering apprehension complaint with the Salem District Court on September 19, 1997.

The defendant was indicted for first degree murder on November 6, 1997. Prior to trial, the State moved, without objection, to amend the charge to second degree murder. Then, the defendant entered a plea of guilty to the second degree murder charge with a negotiated sentence of thirty-five years to life. The trial judge took the plea, but scheduled a separate sentencing hearing to allow time for preparation of a presentence report. The judge stated that he would impose the recommended sentence, provided that there was nothing in the report that was "completely untoward," but that if he did not agree with the recommended sentence after a review of the presentence report, the defendant would be allowed to withdraw his plea.

After reviewing the presentence report, the judge rejected the negotiated sentence. The defendant withdrew his plea and the court reversed its prior decision granting the State's motion to amend the charge, reinstating the first degree murder charge. The defendant subsequently moved that the trial judge recuse himself on the ground that his actions created an appearance of bias toward the State. The judge denied the motion.

The defendant also moved to suppress his statements to the police on September 15 and 17. Specifically, he argued that he invoked his right to remain silent during the September 15 interview, and that any statements taken thereafter violated his right against self-incrimination and should be excluded from trial. In addition, he argued that the statements made on September 17 were inadmissible because they were taken in violation of his right to counsel. The trial court denied the motion to suppress.

Following a jury trial, the defendant was convicted of first degree murder and sentenced to life in prison without parole. This appeal followed.

## I. Miranda Rights

The defendant first argues that the trial court erred in admitting statements made during the September 15, 1997 interview because he invoked his right to remain silent after receiving *Miranda* warnings.

We address the defendant's State constitutional claim first, citing federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 233 (1983). Because we have established that the Federal Constitution affords no greater protection than the State Constitution with regard to the defendant's rights under *Miranda*, we will not undertake a separate federal analysis. *See State v. Ford*, 144 N.H. 57, 63 (1999). "[T]he State must establish beyond a reasonable doubt that it did not violate the defendant's constitutional rights under *Miranda* before the defendant's [statements] may be admitted as evidence." *State v. Chapman*, 135 N.H. 390, 394 (1992). On appeal, we review the evidence before the trial court that the State satisfied this burden in the light most favorable to the State. *See id.*

The defendant does not dispute that he initially waived his *Miranda* rights on September 15, nor does he assert that any of his statements were involuntary. Rather, he argues that he invoked his right to silence twice during the interview, thereby requiring the detectives to cease questioning. In *Miranda*, the Supreme Court held that if an accused in police custody, warned of his *Miranda* rights, "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. The Court reasoned that "[w]ithout the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." *Id.* at 474. "In order to determine whether, after initially waiving his constitutional rights under *Miranda*, the defendant subsequently invoked his right to remain silent, we examine the defendant's statements by considering the totality of the circumstances." *Chapman*, 135 N.H. at 394. When a defendant invokes his right to remain silent, the police must "scrupulously honor" that invocation. *See State v. Laurie*, 135 N.H. 438, 442, *cert. denied*, 506 U.S. 886 (1992). We consider whether "the totality of the circumstances inherent in the case . . . illustrate that the suspect *actually* invoked his right." *Mayes v. State*, 8 S.W.3d 354, 359 (Tex. Ct. App. 1999) (quotations and brackets omitted).

The relevant exchange between the defendant and Detective Swift was as follows:

Swift: If that's the story you want to stick with? There's some evidence that may prove otherwise.

Defendant: Go ahead, it's the story I'm staying with, that's my story.

Swift: That's your story? Or that's the truth?

Defendant: That's the truth, that's my story. I don't know what more you want me to say. You guys got some stares, eh?

Swift: What do you mean by that?

Defendant: Huh? Well you're both just staring at me.

Swift: Well, Eric, I don't think you're telling the truth.

Defendant: Well, I'm telling the truth.

Swift: We're talking about a double homicide!

Defendant: I know what we're talking about.

Swift: Have all three of you concocted a story? Is that why you've been staying together?

Defendant: No. We've been staying together cause it's easier to stay together. We're friends and we're not gonna split up and run out on each other.

Swift: *And you've got nothing else to say?*

Defendant: *No, sir.*

Swift: Anybody else in the park? When you left? You just left the girls there?

Defendant: Yeah, they said they were gonna leave in a little bit, see if Dan was gonna come by and we're like all right, we're not waiting and we left, it was only them two.

. . . .

Swift: That's right. Uh, and you don't have any idea what happened?

Defendant: No, when we left them they were absolutely fine.

Swift: *Okay, is there anything else you want to tell me?*

Defendant: *No, sir.*

Swift: That's what you want to stick with?

Defendant: Yes, sir.

Swift: Okay, uh, 11:29 at the end of the interview for now.

(Emphasis added.)

In denying the defendant's motion to suppress, the trial court stated that "[t]he defendant's response to the detective's question was nothing more than a continued assertion that he had no more information to offer regarding the murders. It was not a statement that he no longer wished to answer questions." We agree.

Under the totality of the circumstances, the defendant did not invoke his right to remain silent and terminate questioning at any time during the interview. We construe the defendant's statements as affirmations of his version of what occurred on the day of the murder, rather than as assertions of the right to remain silent. In the discussion leading up to the defendant's first statement, Detective Swift stated that he believed the defendant was not being truthful, which the defendant continually denied. Under these circumstances, the defendant's response to the question as to whether he had anything else to say was a further affirmation that he was telling the truth about what happened, not an invocation of the right to remain silent. *See Chapman*, 135 N.H. at 395-97.

Similarly, the defendant's second statement was not an invocation of the right to remain silent. At that point in the interview, Detective Swift was asking the defendant questions about his story that the girls were fine when he left the scene and that he had no idea what happened to them. Thus, the defendant's response of "No, sir" was simply a further affirmation of his innocence.

■ The defendant gave no suggestion during the interview that he wanted to terminate it and stop speaking to the detectives. On the contrary, the defendant voluntarily answered additional questions. In sum, both statements, when considered in context, constitute denials of involvement in the murder, not assertions of the right to remain silent. "Because we conclude that neither statement made by the defendant constituted even an equivocal assertion of his right to remain silent, we need not consider whether [Detective Swift] should have asked a clarifying question." *Id.* at 398; *see also United States v. D'Antoni*, 856 F.2d 975, 980 (7th Cir. 1988), *cert. denied*, 516 U.S. 969 (1995). The trial court did not err in denying the defendant's motion to suppress statements made during the September 15, 1997 interview.

*II. Right to Counsel*

The defendant next argues that the trial court's failure to suppress statements made during the September 17 interview deprived him of his right to counsel under Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment of the Federal Constitution.

■ We address the defendant's State constitutional claim first, citing federal law only to aid in our analysis. *Ball*, 124 N.H. at 233. A criminal defendant's right to counsel under both the State and Federal Constitutions attaches when adversary proceedings have commenced through a formal charge, preliminary hearing, indictment, information, or

arraignment. *State v. Kilgus*, 128 N.H. 577, 593 (1986). The right to counsel is designed to give a defendant the benefit of legal advice when making important decisions regarding the case. *See id.*

■ We have held that adversary judicial proceedings are commenced by the *filing* of a complaint in court, and not merely by the signing of the complaint. *State v. Chaisson*, 123 N.H. 17, 29 (1983). Because the hindering apprehension complaint was not filed with the Salem District Court until September 19, 1997, the defendant's right to counsel did not attach for purposes of the interviews on September 15 and 17. The defendant argues, however, that our holding in *Chaisson* should not control this case because here the sworn complaint and arrest warrant were presented to and signed by a justice of the court instead of a justice of the peace.

The rationale underlying the requirement that adversary judicial proceedings are not commenced until a complaint is filed is that "[u]ntil a complaint is filed in court, the State is not committed to prosecute, and the defendant is not obligated to defend himself." *Id.* Once the complaint is filed, the defendant is "faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Id.* (quotation omitted). That a justice of the court, rather than a justice of the peace, issues a complaint is not material under this reasoning. We, therefore, find no reason to ignore our holding in *Chaisson*, and we conclude that the defendant's right to counsel had not attached when he made his statements on September 17.

Alternatively, the defendant argues that his right to counsel attached at the extradition hearing in Michigan on September 16, 1997, because the State submitted a certified copy of the complaint to the Michigan court. He asserts that his right arose out of the New Hampshire charges and not from the extradition proceeding. We disagree. The assistance of counsel is provided at critical stages of criminal proceedings in order to preserve a defendant's right to a fair trial. *State v. Petkus*, 110 N.H. 394, 397 (1970), *cert. denied*, 402 U.S. 932 (1971). While we have not previously addressed this issue, numerous federal and state courts hold that a defendant's right to assistance of counsel does not attach at an extradition hearing. *See, e.g., Judd v. Vose*, 813 F.2d 494, 497 (1st Cir. 1987); *People v. Young*, 607 N.E.2d 123, 133 (Ill. 1992), *cert. denied*, 510 U.S. 829 (1993).

■ "[A]n extradition hearing has a modest function not involving the question of guilt or innocence, and is not a criminal proceeding within the meaning of the sixth amendment." *Judd*, 813 F.2d at 497 (quotations omitted); *see also Reeves v. Cox*, 118 N.H. 271, 275 (1978) (guilt or innocence not at issue during extradition hearing). "Because the only

purpose of extradition is the return of the fugitive to the place of the alleged offense, his constitutional rights, other than the present right to personal liberty, are not involved." *State v. Waggoner*, 864 P.2d 162, 165 (Idaho Ct. App. 1993). An extradition proceeding is not a mechanism used to inquire into the merits of a specific charge. *See Young*, 607 N.E.2d at 132. Thus, given the nature of extradition proceedings, the scope of inquiry at such proceedings does not involve the type of preliminary inquiry that traditionally occurs at critical stages between initial arrest and trial. *See id.* at 132-33. Consequently, we hold that the defendant's right to counsel did not attach at the extradition hearing on September 16, 1997.

Because the Federal Constitution provides no greater protection in this area than does the State Constitution, *see Chaisson*, 123 N.H. at 29; *Judd*, 813 F.2d at 497, we need not undertake a separate federal analysis. *See State v. Cotell*, 143 N.H. 275, 282 (1998).

*III. Recusal*

Finally, the defendant argues that the trial court erred in denying his motion for recusal. Specifically, he argues that the trial judge rejected a negotiated sentence based upon information in a presentence report without affording him an opportunity to respond to the information contained in the report. He contends that the trial judge prejudged the case and gave a reasonable appearance of bias toward the State, thereby warranting his recusal.

The party claiming bias "must show the existence of bias, or such likelihood of bias, or an appearance of bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of [a party]." *State v. Fennelly*, 123 N.H. 378, 384 (1983) (quotation omitted).

Here, the defendant has not made a showing of bias on the part of the trial judge. A "plea bargain standing alone is without constitutional significance." *State v. O'Leary*, 128 N.H. 661, 664 (1986) (quotation omitted). Thus, a trial judge is vested with wide discretion when considering plea agreements and is free to reject an agreement. *See id.* at 665. It was a legitimate exercise of discretion for the trial judge to reject the negotiated plea and sentence based upon information in the presentence report. *See State v. Aubert*, 118 N.H. 739, 741 (1978).

Further, the transcript from the sentencing hearing indicates that defense counsel disputed the judge's decision, arguing that the judge should not rely upon the statements contained in the report. The judge considered counsel's comments and made his decision. As a result, the defendant had an opportunity to voice his concerns about the court's

decision. In addition, the mere rejection of a negotiated plea does not imply bias in favor of either party. We recognize that just because a judge is authorized to reject a sentencing agreement does not mean his conduct could not lead a reasonable person to question his partiality. Under the circumstances on the record before us, however, we conclude that a reasonable person would not question the impartiality of the trial judge, and he therefore was not required to recuse himself.

*Affirmed.*

BROCK, C.J., and NADEAU, J., concurred.