Strafford
No. 2009-535

THE STATE OF NEW HAMPSHIRE

v.

JOSEPH A. MUNROE

Argued: February 10, 2011
Opinion Issued: March 31, 2011

*Michael A. Delaney*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. After a jury trial in Superior Court (*Brown*, J.), the defendant, Joseph A. Munroe, was convicted of six counts of aggravated

felonious sexual assault (AFSA), one count of felonious sexual assault (FSA), one count of felony indecent exposure, and one count of misdemeanor child endangerment. *See* RSA 632-A:2 (Supp. 2010); RSA 632-A:3 (Supp. 2010); RSA 645:1 (Supp. 2010); RSA 639:3 (2007). On appeal, the defendant argues the trial court erred by: (1) finding the child complainant competent to testify; (2) permitting hearsay testimony from a pediatrician; (3) denying his motion to dismiss; and (4) issuing jury instructions that constructively and erroneously amended one of the indictments. We affirm in part and vacate in part.

The jury could have found the following facts. In the spring of 2008, the defendant was living in a trailer home in Milton with his pregnant wife, E.F., their one-year-old daughter, K.M., and E.F.'s three children from her previous marriage to L.M.: son D.M., age nine years; daughter A.M., age three years; and daughter V.M., age seven years, the victim herein. Because the home was crowded with belongings and the outermost bedrooms did not have adequate heat, only one of the three bedrooms in the trailer was used by family members for sleeping. The defendant and E.F. slept on the futon couch in the living room, K.M. slept in a crib next to the couch, and D.M. slept adjacent to the couch on the floor. V.M. and A.M. generally slept in the one usable bedroom together, but at the time of the events at issue they too were sleeping in the living room because a family friend, C.F., had moved into their home and was using the bedroom.

On an evening in April 2008, E.F. left the children in the care of the defendant. C.F. was working, D.M., A.M., and K.M. were playing video games in the bedroom, and V.M. was lying on the couch watching television with the defendant. V.M. was wearing pink pajamas and a "pull-up" to protect against nighttime wetting. The defendant first pulled down V.M.'s pajama bottoms and she pulled them back up. The defendant then pulled down her pajama bottoms and her pull-up, as well as his pants, got on top of her as she lay on the couch, and touched his penis to her vagina. The defendant moved his body "up and down" while touching her bottom with his hands. The defendant then knelt by her feet and performed cunnilingus on her. At some point, the defendant went into the bathroom and came out "wiggling" his penis in his hand. He also showed V.M. a picture on his cellular telephone of a girl showing her bottom.

At some point, the defendant also showed V.M. a video on his Play Station Personal gaming system (PSP) while they sat together on the couch. The video showed the defendant and two women engaging in sexual activity. Although V.M. tried to stop watching the video, the defendant kept pushing her head down to view it.

Several weeks after this incident, E.F. and C.F. were out of the house and the defendant was watching the children. V.M.'s siblings were in the

bedroom and the defendant and V.M. were on the couch in the living room. The defendant pulled down V.M.'s purple pajama bottoms and her pull-up, licked his finger before moving it "up and down" in her vagina, and then licked his finger again. The defendant also lay on top of V.M., rubbing his penis against her vagina. The defendant then placed his penis in her mouth and pushed her head down when she tried to pull her head away. After both of these incidents the defendant told V.M. that if she told anyone what had happened "someone else . . . who is mean" would take her away from her family.

Although worried that she might be taken away from her home, V.M. told a school friend, H., that the defendant had "touched her in bad places." This information was related to E.F. by neighborhood parents. Together E.F. and the defendant confronted V.M. The defendant was upset and angry, and told V.M. to "stop lying." V.M. responded that she had just been "kidding" about what she told H.

Approximately two days later, V.M., A.M., and D.M. left to spend the weekend in Gonic with their father, L.M., and his fiancée. Earlier, a school friend had informed D.M. about the incidents between the defendant and V.M., and he told his father what he had heard that Sunday. That afternoon, L.M. drove the children back to the defendant's trailer, where he spoke with the defendant alone. He described the defendant as intoxicated, "a little upset," and "a little nervous" during their conversation.

As L.M. was leaving the trailer park, he saw E.F. He stopped and told her what he had heard from D.M. Upon L.M.'s suggestion, they took V.M. to the Frisbie Memorial Hospital where she was examined by a physician's assistant and then referred to Dr. Gwendolyn Gladstone, a pediatrician with a specialty in child sexual assault, who is employed at Exeter Pediatrics. Hospital personnel contacted the local police to report an alleged juvenile sexual assault. Within a few days, police conducted two forensic interviews with V.M. Following these interviews, police photographed the defendant's screen saver from his cellular telephone, and seized two sets of V.M.'s pajamas, as well as a PSP containing pornographic videos.

On May 22, 2008, eleven days after V.M.'s hospital visit, Dr. Gladstone examined V.M. in her office at Exeter Pediatrics. Dr. Gladstone explained to V.M. and E.F. that she was a medical doctor who was there to examine V.M., and that she looked at children's bodies when they were worried about something or had questions. Dr. Gladstone took a full medical history of V.M. prior to any discussion of the sexual assault allegations. She then conducted separate interviews with both E.F. and V.M. to determine what she might be looking for during her examination of V.M., and finally examined V.M. "top to bottom like a regular checkup." Dr. Gladstone used

a specialized instrument, a culpascope, to examine her genital and anal areas, and drew blood to conduct laboratory tests. Although Dr. Gladstone found no physical evidence of sexual trauma, she testified that this did not mean that the assaults had not occurred because oral and digital vaginal penetration would not usually cause physical trauma to a child.

The defendant was indicted on counts of AFSA, FSA, child endangerment and indecent exposure. At trial, V.M. was found to be a competent witness and testified against the defendant. Further, Dr. Gladstone was permitted to testify as to what V.M. and E.F. had stated to her during the course of her examination of V.M. This appeal followed.

*I. Competency of V.M.*

The defendant first argues that the trial court erred when it found V.M. to be a competent witness. The State contends the defendant failed to preserve this argument for appeal because defense counsel did not renew his objection to V.M.'s competency after the trial court made its ruling following *voir dire* examination of V.M. Assuming without deciding that this argument was properly preserved, we find no error in the trial court's ruling.

█ Witnesses are presumed competent to testify. Although this presumption may be overcome by findings that the witness "lacks sufficient capacity to observe, remember and narrate as well as understand the duty to tell the truth," N.H. R. Ev. 601(b); *see State v. Mills*, 136 N.H. 46, 49 (1992), absent an unsustainable exercise of discretion, we will not overturn the trial court's competency determination where the record contains evidence to support it. *See Mills*, 136 N.H. at 49-50. Because the trial court is able to directly observe the witness as she testifies, its competency determination is entitled to great deference. *Id.* at 50.

The defendant argues that V.M.'s trial testimony demonstrates her inability to understand the difference between truth and fantasy, and to appreciate the importance of truthfulness, thereby establishing her lack of competency. Specifically, the defendant cites the following exchange between State's counsel and V.M. on direct examination:

Q: Do you know the difference between the truth and a lie?

A: Not really.

Q: Not really. Well, let me see if I can help you. If I told you that my tie was red, would that be true or a lie?

A: A lie.

Q: How come?

A: Because it's yellow.

Q: Yeah. If I told you my tie was yellow, would that be true or a lie?

A: True.

Q: Okay. Now, can you answer all of the questions that I'm going to ask you and that this man, Mr. White, is going to ask you just as true as you did my tie question?

A: Yes.

After this exchange, defense counsel objected to V.M.'s competency. The jury was excused and defense counsel was permitted to conduct *voir dire* examination of V.M. The following exchange took place between defense counsel and V.M.:

Q: You were asked if you know the difference between — do you know between right and wrong?

A: (No verbal response.)

Q: Honey, you're going to have to speak —

A: Yes.

. . . .

Q: Do you — do you know the difference between telling a story and relaying real facts?

A: No.

Q: Okay. Do you know that when somebody asks you a question you have to tell them what actually — or you have to answer the question with actual facts?

A: Yes.

. . . .

Q: And do you know that you're not supposed to be repeating something somebody else told you as fact?

A: No.

Q: Okay. Do you know that — do you know the difference or what would — what goes on if you don't tell actually what you know from your own knowledge?

A: Yes.

Q: Okay. So you know that in this room you have to say and answer the questions from what you know?

A: Yes.

Q: And that it's wrong not to answer from what you know[?]

A: Yes.

Counsel for the State then completed the *voir dire* examination, during which V.M. correctly answered questions as to where objects in the room were located and her grade level in school.

■ In light of this testimony, we are not persuaded by the defendant's characterization of the witness as lacking the ability to comprehend the importance of truthfulness and the distinction between truth and fantasy. While V.M.'s answer to the State's initial question of whether she knew the difference between truth and a lie, standing alone, may have initially indicated a lack of competency, her later answers indicated that she was, in fact, capable of distinguishing between the truth and a lie. As noted above, V.M.'s *voir dire* testimony was accurately responsive to specific questions about truthfulness.

Accordingly, we conclude that the trial court did not unsustainably exercise its discretion in finding V.M. competent to testify.

## II. Testimony of Dr. Gladstone

The defendant next argues that the trial court erroneously admitted hearsay when it permitted Dr. Gladstone to testify as to what V.M. and E.F. stated to her during V.M.'s medical examination. The defendant contends that the hearsay statements were not subject to the exception under New Hampshire Rule of Evidence 803(4) because Dr. Gladstone's examination was a part of the State's investigative effort and not an examination for the purposes of medical treatment and diagnosis. The defendant further argues that the statements failed to satisfy the *Roberts* test, necessary for admissibility under Rule 803(4). *See State v. Roberts*, 136 N.H. 731, 740 (1993).

We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion. *State v. Giddens*, 155 N.H. 175, 179 (2007). To demonstrate an unsustainable exercise of discretion, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *State v. Francoeur*, 146 N.H. 83, 86 (2001).

"Hearsay is generally defined as an extrajudicial statement offered in court to show the truth of the matter asserted in the statement." *State v. Soldi*, 145 N.H. 571, 575 (2000) (quotation omitted). Hearsay evidence is generally inadmissible, subject to certain well-delineated exceptions. *Id.*; *see* N.H. R. Ev. 801(c), 802. One such exception, "Statements for Purposes of Medical Diagnosis or Treatment," applies to:

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances indicating their trustworthiness.

N.H. R. Ev. 803(4). The rationale for this exception is that statements made with the purpose of obtaining medical attention are usually made with the motivation to obtain an accurate diagnosis or proper treatment and, thus, they are inherently reliable because there is normally no incentive to fabricate. *Soldi*, 145 N.H. at 575-76.

The defendant's sole objection to this evidence at trial was that Dr. Gladstone's medical examination of V.M. was not for a medical purpose, but, rather, was in furtherance of a criminal investigation, and, therefore, the hearsay exception did not apply. These two purposes, however, are not mutually exclusive. *See State v. Gordon*, 148 N.H. 710, 721 (2002) (upholding admissibility of statements under Rule 803(4) where the sexual assault medical examination was a two-phase evaluation intended to encompass both medical treatment and evidence gathering). Here, the referral to Dr. Gladstone from hospital personnel contained no reference to evidence collecting and indicated that the purpose of the visit was for a sexual assault examination. Dr. Gladstone testified that to her knowledge Frisbie Memorial Hospital was not equipped with a culpascope, which she uses in conducting thorough examinations of child victims, and that she was more qualified to conduct such examinations than the physician's assistant who examined V.M. at the hospital. Dr. Gladstone further testified that the

examination was a medical examination conducted for the care and benefit of V.M., and that she was given no direction by law enforcement officials concerning the collection of evidence. Thus, the evidence supports the conclusion that, from Dr. Gladstone's perspective, at least one purpose of the examination was for the medical diagnosis or treatment of V.M.

The controlling issue, however, is the intent of the declarant. We have interpreted Rule 803(4) as requiring a three-part test for the hearsay exception to apply. *Soldi*, 145 N.H. at 576 (referring to the "*Roberts* test"). First, "[a] court must find . . . that the declarant intended to make the statements to obtain a medical diagnosis or treatment." *Roberts*, 136 N.H. at 740. Second, "the statements must describe medical history, or symptoms, pain, sensations, or their cause or source to an extent reasonably pertinent to diagnosis or treatment." *Id.* at 741 (quotation omitted). Third, the court must find that the circumstances surrounding the statements support their trustworthiness. *Id.* at 743.

Because the defendant's sole objection was to the purpose of Dr. Gladstone's examination, our analysis focuses on the first prong of the *Roberts* test. With respect to the intent requirement, "we require extra care in determining the declarant's intent" when the declarant is a child. *State v. Graf*, 143 N.H. 294, 303-04 (1999) (quotations omitted). This is because "[i]t is difficult for a court to discover whether a young child completely understands the purpose for which information is being obtained from her." *State v. Wade*, 136 N.H. 750, 755 (1993). Thus, it is necessary to establish that the child had the requisite intent "by showing that the child made the statements understanding that they would further the diagnosis and possible treatment of [her] condition." *State v. Lowe*, 140 N.H. 271, 273 (1995).

In arguing that no such showing was made in this case, the defendant relies upon *Wade*, in which a five-year-old child revealed to a pediatrician that she had been sexually assaulted. *Wade*, 136 N.H. at 752. There, the trial court admitted the child's statements under Rule 803(4), stating: "[T]his falls within 803(4), as this is taking a medical history. The doctor has testified what his purposes were, and that he had concerns with respect to the safety of the child . . . ." *Id.* at 753 (quotation omitted). The trial court also admitted similar statements the child made to a gynecologist. *Id.* We reversed because, although the doctors testified about their states of mind and intentions in speaking with and examining the child, nothing in the record shed any light on the child's intentions in making the statements. *Id.* at 756.

■■ We are mindful that while a declarant's intent may be established with circumstantial evidence, we "will not assume, absent a record affirmatively establishing the proposition, that a young child possessed a sufficient treatment motive to allow her out-of-court statements to a physician to be introduced at trial." *Id.* at 755. In contrast to *Wade*, however, the circumstances of this case are sufficient to permit an inference that V.M. made the subject statements to Dr. Gladstone with the understanding that the doctor was examining her for a medical purpose.

Dr. Gladstone testified that she explained to both V.M. and E.F. that she was a medical doctor who was there to examine V.M. and to help her with questions or concerns that she had with her body. In fact, Dr. Gladstone took a complete medical history of V.M. before the allegations of sexual assault were discussed. Dr. Gladstone then conducted a thorough, "head-to-toe" examination of V.M., including drawing her blood for laboratory tests. The examination was conducted in a medical office, with all the equipment that a young child would recognize as indicative of a doctor's visit. Moreover, V.M. was seven years old at the time and had nearly completed the first grade. Under all the circumstances, it may be reasonably inferred that V.M. understood that any statements she made to Dr. Gladstone were for the purpose of obtaining medical help.

■ The defendant argues that the lack of temporal proximity between the assaults and the examination precludes a finding that the statements were made for a treatment purpose. While we have stated that temporal proximity can indicate a declarant's statements were made for the purpose of seeking medical treatment, *see Soldi*, 145 N.H. at 577, a lack of temporal proximity is not dispositive of the issue of intent. Indeed, Rule 803(4) expressly states that such statements are admissible "regardless of to whom the statements are made, *or when the statements are made*, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances indicating their trustworthiness." (Emphasis added.) Given all the testimony, and the reasonable inferences that may be drawn therefrom, we conclude that the trial court did not unsustainably exercise its discretion when it permitted Dr. Gladstone's testimony pursuant to Rule 803(4).

As to the defendant's arguments on appeal that some of V.M.'s statements admitted through Dr. Gladstone's testimony lacked the requisite trustworthiness, and that other statements were not reasonably pertinent to diagnosis and treatment under the *Roberts* test, these arguments were not preserved at trial and we therefore decline to address them. *LaMontagne Builders v. Brooks*, 154 N.H. 252, 258 (2006) (quotation omitted).

Insofar as the defendant argues that E.F.'s statements to Dr. Gladstone in the course of treating her daughter were inadmissible under Rule 803(4), we note that "[t]he plain language of the Rule does not limit its application to patient-declarants." *United States v. Yazzie*, 59 F.3d 807, 813 (9th Cir. 1995); *see also* 2 G. DIX ET AL., MCCORMICK ON EVIDENCE § 277, at 481-82 (6th ed. 2006) (noting that the rule does not require the statements be made by the patient, and that "statements by others, most often close family members, may be [admitted] if the relationship [to the patient] or the circumstances give appropriate assurances" of trustworthiness). However, because the defendant failed to adequately develop this issue in his brief, we decline to review it. *See State v. Blackmer*, 149 N.H. 47, 49 (2003) ("complaints regarding adverse rulings by the trial court, without developed legal argument, [are] insufficient to warrant judicial review" (quotation omitted)).

*III. Motion to Dismiss*

The defendant further argues that the trial court erred in denying his motion to dismiss the AFSA charge alleging digital penetration at the close of the State's case, based upon insufficient evidence. The State contends that the defendant failed to preserve this sufficiency challenge, but that, in any event, the evidence was sufficient.

We assume without deciding that the defendant preserved his sufficiency challenge in the trial court. However, we agree with the State that sufficient evidence was presented for a rational jury to conclude beyond a reasonable doubt that the defendant committed AFSA by digital penetration.

Our standard for review in this area is well established:

> To prevail in a challenge to the sufficiency of the evidence, the defendant bears the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt. In reviewing the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation. Circumstantial evidence may be sufficient to support a finding of guilty beyond a reasonable doubt. Further, the trier may draw reasonable inferences from facts proved and also inferences from facts found as a result of other inferences, provided they can be reasonably drawn therefrom.

*State v. Young*, 159 N.H. 332, 338 (2009) (quotation omitted).

The basis for the defendant's argument is that V.M.'s statements to Dr. Gladstone, which were admitted through Dr. Gladstone's testimony, were

inadmissible hearsay, and that absent Dr. Gladstone's testimony there was insufficient evidence to prove digital penetration. As noted above, however, Dr. Gladstone's testimony was properly admitted under Rule 803(4).

 Pursuant to RSA 632-A:2, I, (*l*) (Supp. 2010), a person is guilty of the crime of aggravated felonious sexual assault if such person engages in sexual penetration with another person when the victim is less than thirteen years of age. RSA 632-A:1, V(a)(5) (Supp. 2010) defines sexual penetration as "[a]ny intrusion, however slight, of any part of the actor's body, including emissions, or any object manipulated by the actor into genital or anal openings of the victim's body." At trial, Dr. Gladstone testified that V.M. told her the defendant "licked his finger and put it into [V.M.'s] private and moved it up and down."

Viewing all the evidence in the light most favorable to the State, we conclude there was sufficient evidence for a rational jury to conclude that the defendant's finger penetrated V.M.'s vagina.

*IV. FSA Instruction*

The defendant finally argues that in its instructions to the jury on the felonious sexual assault charge, the trial court erroneously substituted the word "genitalia" for "buttocks," thereby effectively eliminating the distinction between the FSA charge and one of the AFSA charges. The State concedes that the jury instruction was erroneous and that the conviction and sentence on the FSA charge must be vacated. Accordingly we vacate the defendant's conviction and sentence on that charge.

*Affirmed in part and vacated in part.*

DALIANIS, C.J., and DUGGAN, HICKS and LYNN, JJ., concurred.