Rockingham
No. 2010-262

THE STATE OF NEW HAMPSHIRE

v.

JESSE BROOKS

Argued: June 15, 2011
Opinion Issued: October 27, 2011

*Michael A. Delaney*, attorney general (*Janice K. Rundles*, senior assistant attorney general, on the brief and orally), for the State.

*Getman, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* and *Clara E. Lyons* on the brief, and *Mr. Schulman* orally), and *Dwyer & Collora, LLP*, of Boston, Massachusetts (*William H. Kettlewell* and *Maria R. Durant* on the brief), for the defendant.

HICKS, J. The defendant, Jesse Brooks, appeals his conviction of conspiracy to commit murder, *see* RSA 629:3, I, IV (2007); RSA 630:1, I(b), (c) (2007). He argues that the Trial Court (*Nadeau*, J.) erred by allowing the State to introduce prior recorded statements of a witness and by finding that witness competent to testify. He also challenges the trial court's denial of his pre-trial motion to dismiss for lack of a speedy trial. We affirm.

The jury could have found the following facts. In September 2003, the defendant's parents were moving from New Hampshire to Las Vegas,

Nevada. On September 29, the defendant's father, John Brooks (John), loaded two motorcycles into a trailer to move them from a warehouse on Tinker Avenue in Londonderry. The next morning, John discovered that the trailer had been stolen. He suspected that Jack Reid, whom he had hired to help him pack, had committed the theft.

Later that morning, the defendant, who was living in California, called his friend, Andrew Carter, and asked him to go to the warehouse to help his father. Carter went to the warehouse with Michael Benton, who was also a friend of the defendant. When they arrived, John told them about the theft and that he suspected Reid. He stated that he wanted Reid killed and asked if they would help him. That day or the day after, John gave Carter and Benton a shotgun and shells, which he said he wanted used on Reid. Over the next month, he gave them $5,000 for supplies for the murder.

On November 1, 2003, the defendant's cousin was married in Las Vegas. At the wedding, John told the defendant's uncle, Roderick Chamberlain (Roderick), that he suspected Roderick's brother, Dennis Chamberlain (Dennis), of being involved in the theft.

A few days later, the defendant traveled to New Hampshire. During his visit, he, Carter and Benton visited Dennis at his home in Salem. The defendant spoke with Dennis about the theft (the November 2003 conversation). Dennis testified that the defendant asked him if he had had anything to do with the theft and "did [he] know anybody that did any stealing or anything." Dennis replied, "[A]bsolutely not." The defendant said that he was going to look around and see if he could find his father's property, and also stated that he had a gun, some money, and a passport. Benton testified that the defendant asked Dennis if he thought Reid was involved in the theft, and Dennis indicated that he did not think that was possible.

Later during the defendant's visit, Carter drove the defendant, Benton, John, and the defendant's former girlfriend to Reid's house at approximately 1:00 a.m. and dropped the defendant and Benton off. The defendant had a "mag light" flashlight and Benton had an aluminum baseball bat. Benton testified that they planned to use these items to hit Reid. Benton stayed behind a truck while the defendant went to one side of Reid's house and kicked it. Reid came out of his house and fired gunshots. A few minutes later, he called the police. The defendant and Benton left and later met at the defendant's family home. Subsequently, the defendant, John, Carter, and Benton decided to stop pursuing Reid for a while because he had called the police. After this incident, the defendant returned to California and John returned to Las Vegas.

In June 2005, the defendant called Benton and asked if John could get in touch with him because John was going back to New Hampshire to take

care of his problem with Reid. Benton agreed. Around the same time, John recruited Joseph Vrooman to assist in killing Reid. The defendant, John, and Vrooman met at John's house in Las Vegas where they made plans to carry out the murder. The defendant indicated that Benton would be expecting a call from John once he got to New Hampshire. He told Vrooman that Reid carried a gun, that he wanted his father to wear a bullet-proof vest, and he wanted Vrooman to make sure that his father did not get hurt. The defendant also suggested ways to subdue Reid.

On or about June 18, John and Vrooman flew to New Hampshire. Over the next few days, John met with Vrooman, Benton and Robin Knight, another friend of John's from Las Vegas, to plan the murder. During that week, John telephoned the defendant two times, once telling him the date they planned to kill Reid and instructing him to use his credit card to take his mother out to dinner that day.

On June 27, 2005, John, Benton, Vrooman and Knight lured Reid to a farmhouse in Deerfield and murdered him. *See State v. Knight*, 161 N.H. 338, 339-40 (2011) (describing the murder). Immediately following the murder, John gave Benton $5,000, and told him there would be more money later. Later that night, John telephoned the defendant to ask if he had taken his mother out to dinner and used his credit card as instructed. He also indicated that the murder had been committed and said that he would talk with the defendant when he returned to Las Vegas.

On July 1, John, Vrooman and Knight flew back to Las Vegas. Upon their return, John gave Vrooman $2,500 and said that he still owed him more. Over the next year, the defendant and John gave Vrooman a total of approximately $10,000.

In late July 2005, Benton asked John for money. John told Benton to call the defendant and, when he did, the defendant wired him $400. In August, Benton again asked the defendant for money to go to Las Vegas and the defendant wired him $800. While in Las Vegas, Benton told the defendant that he "killed [Reid] for your family." The defendant responded that he knew. Phone records, surveillance video, and other evidence found after the murder led the police to the defendant, John, Benton, Vrooman and Knight. On February 5, 2007, the defendant was arraigned for conspiracy to commit murder.

At trial, the State called Dennis to testify. During his testimony, Dennis stated that he had recently had surgery for brain cancer, which affected his memory. The court conducted a competency hearing and found Dennis to be a competent witness. During Dennis's testimony, the State was permitted to introduce portions of two prior recorded statements Dennis made as recorded recollections under New Hampshire Rule of Evidence 803(5).

On appeal, the defendant argues that the trial court erred in admitting the two prior recorded statements Dennis made and in finding that Dennis was competent to testify. He also argues that he was denied the right to a speedy trial as guaranteed by the State and Federal Constitutions.

*I. Recorded Recollections*

The defendant first argues that the trial court erred in allowing the State to introduce two prior statements under the recorded recollection exception to the hearsay rule. The recorded recollection exception to the hearsay rule allows into evidence:

> [a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his or her memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and may be received as an exhibit unless the court, in its discretion, finds that such admission is unduly cumulative or prejudicial.

N.H. R. Ev. 803(5). To be admissible under this exception, the recorded statement must meet the following foundational requirements:

> (1) the witness once had firsthand knowledge about the event; (2) the witness now lacks sufficient memory of the event to testify fully and accurately; (3) the recorded statement was made at or near the time of the event when the witness had a clear and accurate memory of it; and (4) the recorded statement accurately reflects the witness's knowledge.

*State v. Reid*, 161 N.H. 569, 572 (2011) (quotation omitted).

During the course of Dennis's direct examination, the State questioned him about the November 2003 conversation. Dennis was able to remember some portions of the conversation but not others. Over objection, the trial court permitted the State to read into the record the following portion of a taped statement Dennis made to the Salem Police Department in 2007 regarding the 2003 conversation:

> [The defendant] kind of looked me in the face and he says, well, we know Jack took the truck. I think it was we know Jack took the truck, or something like that, something in some words in effect like that. And he pointed to his jacket. He says, I got ten grand, my passport and a nine millimeter, and I'm not afraid to use it. And that was it.

(Quotation omitted.) Shortly thereafter, the trial court allowed the State to introduce a statement Dennis made at John's 2008 trial that, during the November 2003 conversation, the defendant told him "that [the defendant] c[ould] fly out of the country in a heartbeat if he had to."

Relying solely upon Rule 803(5), the trial court found that the State had met its "burden demonstrating that these statements [we]re admissible" as recorded recollections, noting that Dennis testified that the November 2003 conversation was "fresh in his mind at the time" he made the statements. The defendant contends that this was error because the 2007 and 2008 statements were not made at or near the time of the November 2003 conversation. The State disagrees but argues that even if the trial court erred, the error was harmless beyond a reasonable doubt.

██ ██ Assuming, without deciding, that the trial court erred in admitting both prior statements, we conclude that their admission was harmless. "It is well settled that the erroneous admission of evidence may be harmless if the State proves, beyond a reasonable doubt, that the verdict was not affected by the admission." *State v. Prudent*, 161 N.H. 320, 323 (2010) (quotation omitted). An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *State v. Peters*, 162 N.H. 30, 36 (2011).

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*State v. O'Leary*, 153 N.H. 710, 714 (2006) (quotation omitted).

██ The State argues that the alternative evidence of the defendant's guilt was overwhelming. For the jury to convict the defendant of conspiracy to commit murder, the State was required to prove, beyond a reasonable doubt, that "with a purpose that . . . [the crime of murder as] defined by . . . [RSA 630:1, I(b) or (c)] be committed, [the defendant] agree[d] with one or more persons to commit or cause the commission of [murder], and an overt act [wa]s committed by one of the conspirators in furtherance of the conspiracy." RSA 629:3, I. Thus, the State had to prove that the defendant and at least one other person agreed to commit the crime of murder. *See id.*

We have previously held that "[t]o establish a prima facie case of conspiracy, the State is not required to demonstrate an explicit agreement among the conspirators." *State v. Gilbert*, 115 N.H. 665, 667 (1975). "A tacit understanding between the parties to cooperate in an illegal course of conduct will warrant a conviction for conspiracy." *Id.* The State must show that one of the conspirators has performed an overt act in furtherance of the conspiracy. RSA 629:3, I; *Kilgus*, 128 N.H. at 586. This overt act need not be criminal in character, so long as it shows that the conspiracy is at work. *Kilgus*, 128 N.H. at 586. It "may be any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy." *Id.* at 586-87 (quotation omitted).

Here, the alternative evidence of conspiracy to commit murder included the testimony of Benton and Carter that the defendant telephoned Carter shortly after the theft on September 30, 2003, and asked him if he could go to the warehouse to help his father. When Carter and Benton went to the warehouse, John told them about the theft, that he suspected Reid and that he wanted Reid killed. He then asked them if they would help him and they agreed.

Benton also testified that when the defendant returned to New Hampshire in November 2003, he told Benton that he returned to handle the problem with Reid. During this visit, the defendant had conversations with Benton and Carter in which they told the defendant about their efforts to kill Reid. Benton further testified that the defendant told him that it was "go time," that it would be too late to get John's property back, and it would be no use trying to question Reid so they should probably just try to kill him. Carter testified that the defendant participated in the plan to kill Reid. He stated that, while, unlike John, the defendant would not say that he wanted Reid killed, he also wanted it done.

The alternative evidence also included the testimony of Benton that, during his November 2003 visit, the defendant went to visit Dennis to ask him about the theft and whether Reid was involved. Dennis testified that, during this conversation, the defendant told him that he was going to look around to see if he could find his father's property and that he had a gun, some money and a passport.

Further, the alternative evidence included the testimony of Carter, Benton and the defendant's former girlfriend about the defendant and Benton's visit to Reid's house in November 2003. The defendant's former girlfriend testified that the defendant and Benton said they were going to Reid's house to surprise and question him and possibly tie him up or "something else." Benton testified that their plan was to hit Reid with the baseball bat and the "mag light" flashlight.

The alternative evidence also included Benton's testimony that the defendant called him in early June 2005 to ask whether John could get in touch with him because John was coming to New Hampshire to take care of the problem with Reid. Shortly thereafter, John called Benton and asked to get together to discuss the situation with respect to Reid. Over the next few weeks, John, Benton, Vrooman and Knight planned and carried out Reid's murder. Immediately following the murder, John gave Benton $5,000 in cash, and told him that there would be more money later. A few weeks after the murder, Benton asked the defendant for money and the defendant wired him $400. A month after the murder, Benton again asked the defendant for money to travel to Las Vegas and the defendant wired him $800. Benton testified that while he was in Las Vegas, he told the defendant that he "killed [Reid] for your family" and the defendant responded that he knew.

Further, the alternative evidence included Vrooman's testimony that the defendant was present at a meeting in June 2005 during which he, Vrooman and John made plans to carry out Reid's murder. At this meeting, the defendant suggested ways to subdue Reid. Vrooman also testified that the week before the murder, John twice called the defendant, once telling him the date of the murder and instructing him to use his credit card to take his mother out to dinner on that day. Vrooman further stated that following the murder the defendant gave him money. In addition, the alternative evidence included the admission of numerous phone records, which supported the testimony that the defendant was in contact with Carter, Benton and John throughout the period leading up to the murder.

Finally, the alternative evidence included the testimony of Michael Small, a carpenter who worked for Robin Knight. In December 2004, the defendant and John told Small that they had owned two motorcycles that were stolen. Small testified that both the defendant and John told him that they had a pretty good idea who stole the motorcycles and that person "would get their day."

■ Against this evidence, the recorded statements regarding the November 2003 conversation were merely cumulative and inconsequential. Benton testified that during the November 2003 conversation the defendant asked Dennis whether Reid was involved in the theft. Further, Dennis testified, without objection, that the defendant told him that he was going to look around to see if he could find his father's property and that he had a gun, some money and a passport. Thus, even if the recorded statements had not been admitted, there was evidence that the defendant asked Dennis

whether he thought Reid was involved in the theft, that the defendant was going to look into the theft, and that the defendant had a gun, money and a passport.

The defendant argues that admission of the recorded statements was not harmless because without them "there was no evidence that placed [the defendant] in the conspiracy to murder Jack Reid other than . . . the testimony of cooperating co-defendants Benton and Vrooman" and circumstantial evidence consistent with innocence. The defendant contends that the strength of the State's case turned on the credibility of Benton and Vrooman, and, because they testified against the defendant in exchange for a plea agreement, their testimony was unreliable. He maintains that because Dennis's credibility was not at issue and his "hearsay supported Benton and Vrooman's accounts, it could well have tipped the jury's finding in favor of the State." We disagree. Dennis's recorded statements added little, if anything, to his other testimony regarding the November 2003 conversation. We cannot say that they bolstered the credibility of Benton and Vrooman's testimony in such a way as to have affected the verdict. Moreover, as demonstrated above, the defendant's argument that Dennis was the only witness who corroborated Benton and Vrooman's testimony is belied by the testimony of Carter, Small and the defendant's former girlfriend.

The defendant further argues that this error was not harmless because without the recorded statements the jury was "given only circumstantial flotsam and jetsam completely consistent with innocence." "[A] rational fact finder may infer guilt from circumstantial evidence if such evidence excludes all other rational conclusions." *State v. Cole*, 139 N.H. 246, 250-51 (1994). Indeed, "[s]ince direct evidence of a conspiracy is often difficult to obtain, the existence of a conspiracy frequently must be proved, if at all, by attendant circumstances." *Gilbert*, 115 N.H. at 667. In this case, we conclude beyond a reasonable doubt that based on all the evidence, any error in the admission of the 2007 and 2008 statements was harmless. *Cf. Cole*, 139 N.H. at 251. Accordingly, based upon our review of the record, we conclude that the State has met its burden of proving that any error in admitting Dennis's 2007 and 2008 statements was harmless beyond a reasonable doubt.

## II. Competency of Dennis

The defendant next argues that the trial court erred when it found Dennis competent to testify. The competency of a witness to testify before the jury is a threshold question of law committed to the trial court's discretion. *State v. Keyes*, 114 N.H. 487, 489 (1974). When the record

contains evidence to support the trial court's determination of competency, we will not disturb that determination absent an unsustainable exercise of discretion. *State v. Munroe*, 161 N.H. 618, 623 (2011).

Witnesses are presumed competent to testify. *Id.* However, "this presumption may be overcome by findings that the witness lacks sufficient capacity to observe, remember and narrate as well as understand the duty to tell the truth." *Id.* (quotation omitted). Here, the defendant challenges Dennis's capacity with respect to his ability to remember events "he was called to testify about." He maintains that, "as a result of his brain surgery, Dennis Chamberlain's memory of the events at issue, including his meeting with Jesse Brooks in 2003, was so badly impaired that" it rendered him incompetent to testify.

During the competency hearing, Dennis testified from memory about various facts and circumstances related to the events about which he had been called to testify. He was able to recall his nephew's wedding in Las Vegas in early November 2003, including the fact that John suspected him of stealing. While he could not initially recall Reid's name, he correctly remembered that John suspected "an old truck driver . . . that ended up dying" of the theft and, once prompted, he recalled that this person's name was Jack Reid. He further recalled that Roderick arranged a meeting for him and John shortly after the wedding and he was able to recall the details of that meeting. He also recalled that the defendant and his friends came to visit him at his house and that the defendant asked him questions about whether he was involved in the theft. He remembered that the defendant told him that he was going to look into the thefts and that he had a gun, a pocket full of money and a passport.

The defendant points to Dennis's testimony that he was feeling "a little confused" and that he had "good days [and] bad days" and that, on that day, he was "not having a good day . . . at all" as evidence of his incompetency as a witness. Admittedly there were times Dennis professed confusion during his testimony. However, Dennis also testified that his confusion about things "comes and goes" and "only lasts a short time." More importantly, as discussed above, Dennis was able to recall certain facts and circumstances about the events for which he was called to testify. Intermittent confusion over certain issues and questions does not necessarily render a witness incompetent. *Cf. People v. Watson*, 629 N.W.2d 411, 420 (Mich. Ct. App. 2001) (noting that court had upheld a trial court's determination of a child's competency, though witness displayed confusion and contradiction). In our view, this "is simply an appropriate subject for argument to the jury, whose responsibility it was to determine witness

credibility." *State v. Briere*, 138 N.H. 617, 621 (1994) (contradictions in the witness's testimony did not render her incompetent).

The defendant further cites specific memory lapses and inconsistencies in Dennis's testimony, including his failure to initially recall why he had been subpoenaed to testify and, on one occasion, referring to Jesse Brooks as John. "Inconsistencies in testimony and a failure to remember aspects of the subject of the testimony, however, do not disqualify a witness. They present questions of credibility for resolution by the trier of fact." *Id.* at 620 (quotation omitted). Since so much of a trial court's competency determination depends upon its observation of the witness, we give great deference to the trial court's conclusion that Dennis was competent. *See State v. Mills*, 136 N.H. 46, 50 (1992). "The question is not whether we would have ruled as the trial court did, but whether there is sufficient evidence in the record to ground the finding." *Id.* Based upon our review of the record in this case, we conclude that the trial court did not unsustainably exercise its discretion in finding Dennis competent to testify.

*III. Speedy Trial*

Finally, the defendant argues that the thirty-two month delay between his arraignment and his trial violated his right to a speedy trial guaranteed by the State and Federal Constitutions. We first address the defendant's claim under our State Constitution and cite federal cases for guidance only. *See State v. Ball*, 124 N.H. 226, 231-33 (1983).

In determining whether a defendant's right to a speedy trial has been violated under the State Constitution, we apply the four-part test articulated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972). *State v. Allen*, 150 N.H. 290, 292 (2003). The test requires us to balance four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant caused by the delay. *Id.* We defer to the trial court's factual findings unless those findings are clearly erroneous, and consider *de novo* the court's conclusions of law with respect to those factual findings. *Id.*

The first factor, the length of the delay, is a triggering mechanism: we do not consider the remaining factors unless the delay is presumptively prejudicial. *State v. Locke*, 149 N.H. 1, 8 (2002). The period of delay considered for purposes of analyzing a defendant's speedy trial claim begins to run when he is arrested or charged, whichever comes first. *Humphrey v. Cunningham, Warden*, 133 N.H. 727, 734 (1990). A delay of over nine months in a felony case is considered presumptively prejudicial. *See id.* at 734-35. Here, the defendant was arraigned for conspiracy to

commit murder on February 5, 2007, and initially indicted on November 9, 2007. His trial commenced on October 28, 2009. Because this delay is "presumptively prejudicial," it warrants an examination of the remaining three *Barker* factors. *State v. Maynard*, 137 N.H. 537, 539 (1993).

The second factor requires that we assess why the trial was delayed, to which party the delay is attributable, and how much weight to give the delay. *Allen*, 150 N.H. at 294. The trial court found that most of the delay in this case was attributable to the State but that a portion of the delay was in furtherance of the practical administration of justice, *see Maynard*, 137 N.H. at 539, and the remainder of the delay was due to the vicissitudes of scheduling and, thus, did not weigh heavily against the State, *see Allen*, 150 N.H. at 294. The record amply supports these findings. The defendant's trial was originally scheduled to begin on January 19, 2009, after the State had filed two assented-to motions to continue. In June 2008, the State sought to reschedule the defendant's trial date to April 2009, asserting that it was necessary to switch the defendant's trial date with that of co-defendant Knight in order to try Knight first because Knight was indicted earlier and had been incarcerated for a longer period of time than the defendant. The State further contended that because Knight made certain statements to the police that it sought to use against the defendant, it needed to have Knight's charges resolved before the defendant's trial. On July 9, 2008, the Trial Court (*Lynn*, C.J.) granted the State's request and rescheduled Knight's trial for February 2, 2009, and the defendant's trial for March 9, 2009. Subsequently, the trial court reported that, "[d]ue to the state budget crisis, the Rockingham County Courthouse cancelled all February 2009 jury trials." As a result, Knight's trial was moved to May 2009. On December 9, 2008, the Court (*Nadeau*, J.) rescheduled the defendant's trial for October 26, 2009, which, according to the trial court, was "the earliest available date." Thus, while the delay from January to October 2009 is held against the State, it weighs less heavily than would a delay for other reasons. *See Maynard*, 137 N.H. at 539.

"This court puts substantial emphasis on the latter two of the *Barker* factors." *State v. Langone*, 127 N.H. 49, 55 (1985) (quotation omitted). Under the third factor, we consider the strength of a defendant's assertion of his right to a speedy trial. *State v. Lamarche*, 157 N.H. 337, 343 (2008). "The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32.

In this case, the trial court specifically found that this factor weighed in the defendant's favor, but not heavily, since the defendant waited fifteen

months before first asserting his right to a speedy trial. The defendant argues that this was error. We disagree.

The defendant first asserted his right to a speedy trial on May 23, 2008, in a motion requesting that he retain his January 2009 trial date. He then moved to dismiss for a violation of his speedy trial rights in February 2009. Furthermore, as conceded by the State below, prior to first expressing his right to a speedy trial, the defendant sought "the earliest trial date possible." Thus, this factor weighs in the defendant's favor. Nonetheless, the defendant acquiesced to the State's two motions to continue and to the original January 2009 trial date, which was twenty-three months after his arraignment. Moreover, he waited fifteen months from the time of his arraignment to first assert his right to a speedy trial. The fact that the defendant initially acquiesced to a trial date twenty-three months after his arraignment, and waited fifteen months to first assert his speedy trial rights, supports the trial court's finding that this factor does not weigh heavily in his favor. *See Lamarche*, 157 N.H. at 343 (finding that this factor did not weigh heavily in the defendant's favor when the defendant waited ten months between his indictment and the assertion of his right to a speedy trial).

■■ The final factor requires us to determine whether and to what extent the defendant suffered prejudice, including whether the delay resulted in an oppressive pretrial incarceration, anxiety, or an impaired defense. *Id.* at 344. The defendant argues that he has suffered prejudice because the delay "denied the defense a meaningful opportunity to confront Chamberlain on cross-examination" as a result of his brain surgery "five or six months before trial." The State asserts that the defendant failed to preserve this argument. We agree. The defendant, as the appealing party, has the burden to provide this court with a sufficient record to decide his issues on appeal and demonstrate that he raised the issues before the trial court. *See State v. Winward*, 161 N.H. 533, 542 (2011). "Preservation of an issue for appeal requires a contemporaneous and specific objection." *State v. Dodds*, 159 N.H. 239, 244 (2009) (quotation and brackets omitted). Here, the defendant did not adequately raise this issue before the trial court and, thus, failed to preserve it for review.

The defendant contends that "in objecting to Chamberlain's competency [at trial, his counsel] specifically cited impairment to [his] confrontation right." Nonetheless, the defendant failed to argue below that Chamberlain's memory loss caused him prejudice in relation to an alleged speedy trial violation. *Cf. Winward*, 161 N.H. at 542. Indeed, in its order denying the defendant's motion to dismiss, the trial court noted that the defendant did not claim that any witnesses "suffered loss of memory." There is no

evidence that the defendant renewed his request for dismissal based upon Dennis's subsequent brain surgery. Accordingly, we decline to address this argument.

The defendant next argues that he was "substantially prejudiced by his twenty months of pretrial detention under unique circumstances." He maintains that he "had never previously been incarcerated, and was detained only on the charges in this case." His confinement under these facts alone, however, is insufficient to establish actual prejudice. *See State v. Cotell*, 143 N.H. 275, 283 (1998); *State v. Tucker*, 132 N.H. 31, 33 (1989).

Finally, the defendant argues that "[t]he press attendant to the capital murder case against [his] father was unprecedented" and was "laden with emotion . . . and, even in the context of co-defendants' trials, often focused on" the defendant. He contends that "the prejudice he had suffered from this avalanche of press was irreversible." Beyond these bare assertions, the defendant fails to articulate the nature of the prejudice suffered from the pretrial publicity attendant to John's and his co-defendants' cases. Even if, as the defendant alleges, some of the pretrial publicity may have been "incorrect," the defendant has not shown how this publicity prejudiced his ability to have a fair trial. *Cf. Cotell*, 143 N.H. at 283 (finding, where defendant argued that he was prejudiced by "the exposure of prospective jurors to publicity," that "[p]retrial publicity did not actually prejudice the defendant").

After balancing the four *Barker* factors, we conclude that the defendant was not denied his right to a speedy trial under the State Constitution. Because the Federal Constitution is no more protective of the defendant's rights than the State Constitution under these circumstances, *see Allen*, 150 N.H. at 292, 295; *Barker*, 407 U.S. at 530, we reach the same conclusion under the Federal Constitution.

*Affirmed.*

DALIANIS, C.J., and DUGGAN and CONBOY, JJ., concurred.