NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2015-0358


THE STATE OF NEW HAMPSHIRE

v.

KEVIN LYNCH

Argued:  September 21, 2016
Opinion Issued:  March 10, 2017


Joseph A. Foster, attorney general (Sean R. Locke, assistant attorney general, on the brief and orally), for the State.


Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.


CONBOY, J.  The defendant, Kevin Lynch, appeals his conviction, following a jury trial, of misdemeanor simple assault.  See RSA 631:2-a (2016). He argues that the Superior Court (Wageling, J.) erred by denying his motion to suppress his statements to police allegedly obtained in violation of his Miranda rights.  See Miranda v. Arizona, 384 U.S. 436 (1966).  He also argues that the Superior Court (Schulman, J.) erred by permitting hearsay testimony from a pediatrician at trial.  The State cross-appeals the trial court's order dismissing two indictments post-trial on double jeopardy grounds.  We affirm.

I.  Defendant's Appeal

A.  Suppression Motion

The following facts are taken from the trial court's order denying the defendant's motion to suppress, are established by the evidence submitted at the suppression hearing—which includes the videotaped recording and transcript of the defendant's police interview—or are otherwise undisputed.  On March 7, 2014, Detective Sergeant Munck of the Exeter Police Department interviewed the defendant at the police station regarding an allegation that he had assaulted his girlfriend's three-year-old daughter earlier that day.  At the beginning of the interview, Munck informed the defendant that the interview was being audio- and video-recorded and read him his Miranda rights.  The defendant waived his rights and agreed to speak with Munck.  During the interview, the defendant made incriminating statements.

Prior to trial, the defendant sought to suppress his incriminating statements.  The State objected.  Following a hearing, at which the parties made arguments and introduced the recording of the defendant's interview as the only evidence in support of each party's position, the court denied the defendant's motion.  In doing so, the court noted that the State conceded that the defendant was subjected to custodial interrogation.

On appeal, the defendant argues that, under the State and Federal Constitutions, the trial court erred in denying his motion because he invoked his right to remain silent and his right to counsel after receiving Miranda warnings, and Munck failed to honor his invocation.  See N.H. CONST. pt. I, art. 15; U.S. CONST. amends V, XIV.  We will address the defendant's state constitutional claim first, citing federal law only to aid in our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).

Before a defendant's responses made during custodial interrogation may be used against him, the State must prove, beyond a reasonable doubt, that the interrogation did not violate his constitutional rights under Miranda.  State v. Gribble, 165 N.H. 1, 10 (2013).  On appeal, in reviewing the trial court's finding that the State met its burden, we view the evidence in the light most favorable to the State.  State v. Chapman, 135 N.H. 390, 394 (1992).

The defendant does not dispute that he initially waived his Miranda rights during the March 7 custodial interrogation.  Nor does he assert that his statements were involuntary.  Rather, he argues that he invoked his right to silence and his right to counsel during the interview, thereby requiring Munck to cease questioning.  To determine whether, after initially waiving his constitutional rights under Miranda, the defendant subsequently invoked those rights, we examine his statements under the totality of the circumstances.  See id.; see also Mayes v. State, 8 S.W.3d 354, 359 (Tex. App. 1999).  Although we

2

review a trial court's findings concerning which words a defendant used to invoke his Miranda rights under the clearly erroneous standard, whether the defendant's words constitute an invocation of his rights is a question of law, which we review de novo. State v. Ayer, 154 N.H. 500, 518 (2006).

In Miranda, the Supreme Court held that, if an accused is in police custody, has been informed of his Miranda rights, and "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74; see State v. Jeleniewski, 147 N.H. 462, 465 (2002) ("When a defendant invokes his right to remain silent, the police must 'scrupulously honor' that invocation."). Similarly, the Court held that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Miranda, 384 U.S. at 474; see State v. Grant-Chase, 140 N.H. 264, 267 (1995) (explaining that, if a defendant requests counsel after Miranda warnings have been given or after interrogation has begun, there is "an irrebuttable presumption that the defendant asked for the assistance of counsel for the purpose of having counsel present during any further questioning, and the police [cannot] reinitiate questioning until counsel [is] present"). As we have explained, "This right to counsel is a fundamental one which transcends the enforcement of the criminal law and should be liberally observed by those who have sworn to uphold the constitution, and no effort should be made to discourage the exercise of the right by our citizens." State v. Tapply, 124 N.H. 318, 325 (1983).

Subsequently, in Davis v. United States, 512 U.S. 452 (1994), the Court held that "after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Davis, 512 U.S. at 461. In so holding, the Court explained that, in order "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether an individual has "actually invoked his right to counsel" is based upon an objective inquiry. Id. at 458-59 (quotation omitted). "Invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Id. at 459 (quotation omitted). "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. (quotation and citation omitted). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that a suspect might be invoking the right to counsel," precedent does "not require the cessation of questioning." Id. To require officers to cease questioning in such a situation would force police officers "to make difficult judgment calls about whether the

3

suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." Id. at 461.

The Court went on to observe that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." Id. "Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." Id. But "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-62. The Court has since extended these principles to the invocation of the right to remain silent. See Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (stating that "there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel").

The defendant maintains he invoked his right to remain silent and his right to counsel during the following exchange, which occurred approximately one hour after the interview began and the defendant had been read and waived his Miranda rights:

> [The defendant]: I'm being accused of something that I didn't do and then I mean I guess the only thing I can do is probably stop talking and get a lawyer because obviously it seems like [the defendant's girlfriend] said whatever story. [The victim] is saying whatever story she's saying and I am not a vicious person. I have times where I do get frustrated and all that, but I always take time to take a minute to get away from the situation so I don't do anything I regret. So, I mean, I didn't touch her. I didn't even see her this morning that I remember.
>
> [Munck]: Well, you just mentioned now that you want to stop talking and get a lawyer. Is that what you want? Or do you want to keep talking?
>
> [The defendant]: I mean it just seems like I'm being accused of this.
>
> [Munck]: Well, you are and it's not necessarily, I'm the, I guess the face of the person that's accusing but there's other stuff behind me that's backing that up.
>
> [The defendant]: And I get what you're saying but why would I do something to risk losing my kids?

4

[Munck]: Well, first of all before we keep going, do you want to stop talking and get an attorney or do you want to keep talking with me? That's what I need to know.

[The defendant]: Well, I can't afford an attorney so . . .

[Munck]: Well, you can stop talking and that has no play in it. If you want to stop talking to me you can stop talking to me. The fact that you don't have any money for an attorney you know the Miranda Rights talk about one being provided at your own . . . be provided later. That's not going to be tonight. That's going to be down the line.

[The defendant]: Yeah, so if you guys decide to put me in jail because of this then I'm screwed.

[Munck]: Well, I just need to know, I just need to know from you do you want to stop talking to me now and get an attorney or do you want to stop, keep talking to me? That's the decision that you need to make, not me. You need to make that and let me know.

[The defendant]: Uh, I don't, I don't, I don't know.

[Munck]: Okay, well I can't make it for you. That's something I can't give you advice. I can't do anything like that. You need to make your decision, you need [to] make a decision whether you want to keep talking to me or not.

[The defendant]: I mean, honestly, at this point I just wanna go see my kids cause I'm supposed to be with them right now. I've never done that to [the victim]. I don't see why she would say that.

[Munck]: Do you want to keep talking to me or not? Without an attorney present? I will be more than happy to continue to talk to you and, and do that but I need you to tell me what you want to do.

[The defendant]: I, I, I, don't understand, like what[.]

[Munck]: Okay, what you need to make a decision whether you want to keep talking to me without an attorney or not and then we can keep talking.

[The defendant]: Ya, but if I talk to you, or keep talking, or if I stop talking do I get you [to] drop me back off and then you guys come arrest me? Is that what happens?

[Munck]: Well, what I'm asking you, before, you're thinking four steps ahead. What I need to do is know whether you want to keep talking to me without a lawyer present. That's what I need to know. If you do, then I'll keep talking to you. If you don't then I'll stop talking to you. But, that's a decision, I guess I need you to make that clear to me.

[The defendant]: I'm exhausted. I don't know.

[Munck]: I think you made a mistake and I think you need to come clean on it. That's what I think.

[The defendant]: But I don't do stuff like that.

[Munck]: I know you don't.

[The defendant]: And I wouldn't do that to her.

[Munck]: And I don't think [it's] part of your nature.

[The defendant]: But either way I'm screwed cause even if you know we go to trial and all that and they say oh he really didn't do it. Well, I still have to go through a trial, I gotta bring my kids through that. And then I have or go to trial and then they make mistakes, which has happened a lot in the court then I get screwed anyway. So I don't . . .

[Munck]: I just want to know the truth behind what happened. That's all I want and I'm not getting it.

[The defendant]: I mean, I don't, I don't know what [the defendant's girlfriend] told you.

[Munck]: I know you . . . Well, before we continue I need to know, you went to school for criminal justice[.]

[The defendant]: Yeah[.]

[Munck]: I need to know that you want to keep talking or at least listening to me. But I need to know whether or not you want to continue without an attorney right now. That's what I need to know from you.

[The defendant]: I mean, oh God, I never thought I'd be in this situation.

6

[Munck]: You need to make a definitive decision. You need to make a clear decision for me.

[The defendant]: I guess we'll keep talking but I . . .

[Munck]: Okay, so your decision is that for now you'll keep talking to me without a lawyer?

[The defendant]: Yes[.]

(Emphasis added.)

The trial court found that the defendant's statement at the beginning of this exchange, "I guess the only thing I can do is probably stop talking and get a lawyer," put Munck "on notice that [the d]efendant might wish to remain silent and might be seeking a lawyer," but that it did not constitute "a completely unequivocal invocation" of those rights. The defendant contends that this was error because his statement "adequately conveyed to Munck that [he] wanted to stop talking and consult with a lawyer." We disagree.

An expression of doubt or uncertainty cannot be considered unequivocal. See State v. Gasteazoro-Paniagua, 294 P.3d 857, 860-62 (Wash. Ct. App. 2013). Here, the defendant never explicitly stated that he no longer wished to speak with Munck or that he wished to have an attorney present. Cf. Grant-Chase, 140 N.H. at 267 (holding that defendant adequately indicated to officers that she sought assistance of counsel when she stated that she wanted to call her lawyer, and officer testified that request was unambiguous); State v. Nash, 119 N.H. 728, 731 (1979) (concluding that defendant's statement that "he thought he had better talk to an attorney" constituted a sufficient invocation of his right to counsel). Rather, the defendant stated "I guess the only thing I can do is probably stop talking and get a lawyer." (Emphases added.) The defendant's use of the words "guess" and "probably" convey doubt or uncertainty rather than an unequivocal statement or request. See Davis, 512 U.S. at 462 (determining that defendant's statement "Maybe I should talk to a lawyer" was not a request for counsel); United States v. Clark, 746 F. Supp. 2d 176, 185 (D. Me. 2010) (concluding that defendant's use of the phrase "I guess" in a lowered voice did not constitute an unambiguous invocation of "either his right to counsel or his right to cease questioning" (quotation omitted)); Taylor v. State, 689 N.E.2d 699, 703 (Ind. 1997) (determining that defendant's statement "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know" constituted "an expression of doubt," not an unambiguous assertion of right to counsel (quotation omitted)); Gasteazoro-Paniagua, 294 P.3d at 860 (finding defendant's statement "I mean, I guess I'll just have to talk to a lawyer about it . . ." was not an unequivocal request for counsel).

7

Further, the defendant did not stop talking after making the statement. He made the statement and then immediately continued to talk—explaining to Munck that he did not commit the alleged assault. See Com. v. Vincent, 17 N.E.3d 1045, 1053, 1053-54 (Mass. 2014) (concluding trial judge did not err in finding "defendant's statements concerning possibly needing or wanting a lawyer were ambiguous and equivocal" when defendant continued to talk about incident without hesitation after making statements (quotation omitted)); cf. Chapman, 135 N.H. at 397 (concluding that defendant's statements were not an invocation of his right to remain silent, but were part of a larger statement in which he was arguing his innocence).

Nonetheless, the defendant maintains that "Munck understood that [he] was invoking his rights to silence and counsel" because Munck responded by stating "you just mentioned now that you want to stop talking and get a lawyer" and then asked the defendant, "Is that what you want? Or do you want to keep talking?" Contrary to the defendant's assertion, Munck's statement and subsequent questions demonstrate that it was not clear to Munck whether the defendant had "actually invoked" his right to remain silent or his right to counsel. Davis, 512 U.S. at 458 (quotation omitted).

The defendant further argues that Munck did not "scrupulously honor" his invocation of his right to remain silent and his right to counsel and, instead, "repeatedly asked [the defendant] whether he wanted to continue talking or to stop and get a lawyer." (Quotation omitted.) In Tapply, law enforcement officers, rather than eliminating any ambiguity or doubt that existed as to whether the defendant wished to assert or waive his right to have counsel present during the interrogation, actively discouraged the defendant from asserting his right by diverting his attention to other matters. Tapply, 124 N.H. at 322-24. We held that, "[i]nstead of diverting [the defendant's] attention" from his right to counsel, "the officers had a duty to honor his right." Id. at 325. Here, however, Munck did not fail to honor the defendant's rights, nor did he discourage the defendant from exercising them. Rather, Munck gave the defendant every opportunity to exercise his rights by repeatedly asking him to clarify whether he did, in fact, want to stop talking and get an attorney. Although at one point Munck told the defendant he thought the defendant made a mistake and that he just wanted to know the truth, Munck immediately reiterated that he needed to know whether the defendant wanted to continue talking with him without an attorney. He then again explained that he needed the defendant "to make a definitive . . . clear decision."

In the face of the defendant's ambiguous statement, Munck asked the defendant at least seven times whether he wished to continue talking without an attorney before the defendant clearly stated that he would continue talking. We see nothing improper about Munck's responses to the defendant's ambiguous statement. See State v. Sundstrom, 131 N.H. 203, 207 (1988) (finding that officers responded properly to defendant's ambiguous statement

8

by explaining that he could request a lawyer to be present at any time and by clarifying his indecision by asking defendant who his lawyer was and whether he wanted to speak with his lawyer at that time or later); see also State v. Carpentier, 132 N.H. 123, 128 (1989).

Under these circumstances, we conclude that the defendant did not unambiguously assert his right to remain silent or his right to counsel. See Sundstrom, 131 N.H. at 207 (holding that defendant's statements "I don't know" and "Later. There's no hurry" in response to officer's question about whether defendant wanted to call his attorney did not indicate that he was seeking counsel at that time). Instead, the defendant made an ambiguous statement suggesting that he "might be invoking" his right to remain silent and his right to counsel. Davis, 512 U.S. at 459. Accordingly, we hold that the defendant did not effectively assert either his right to remain silent or his right to counsel, and Munck was not required to stop questioning him. See id. at 461-62; see also Berghuis, 560 U.S. at 381; Sundstrom, 131 N.H. at 207-08. Thus, we conclude the defendant's Miranda rights were not violated, and we find no error in the trial court's denial of his motion to suppress. As the Federal Constitution offers the defendant no greater protection than the State Constitution does under these circumstances, see Jeleniewski, 147 N.H. at 465; Sundstrom, 131 N.H. at 208; Berghuis, 560 U.S. at 381-82, we reach the same result under the Federal Constitution as we do under the State Constitution.

### B. Trial Testimony of Pediatrician

At trial, the State sought to introduce statements made by the victim to Gwendolyn Gladstone, M.D., a pediatrician certified in child-abuse medicine. The State argued that the statements were made for the purpose of medical diagnosis or treatment and, thus, were admissible under New Hampshire Rule of Evidence 803(4). Over the defendant's objection, the court allowed Gladstone's testimony.

Gladstone testified that she was called to Exeter Hospital on the date of the assault because an emergency room physician contacted her and told her that the victim "had been brought [to the hospital] because she had a rash on her face and bleeding in her eyes, and the doctor seeing her wanted to know if [Gladstone] could come and look at her because [the doctor] was concerned that this might not have been accidental." Gladstone explained that, when she arrived at the hospital, she reviewed a CAT scan of the victim, spoke with "people in the emergency department," and then met with the victim and her mother. Gladstone testified that the victim recognized her because they "had met not long before" at two prior unrelated appointments. Gladstone explained that her previous meetings with the victim had been at Gladstone's "medical office where there's medical equipment like lights to look in your eyes and ears and a stethoscope, scale, [and a] blood pressure cuff." She stated that, on the

date of the assault, they met in an examination room in the emergency department at the hospital. She described the room as being "a small room that has a hospital bed in the middle" with a "bright light overhead" and "equipment lights such as the ones to look in eyes and ears," and "oxygen tubing" on the back wall. She stated that the room also contained "a cart with emergency supplies in it."

Gladstone explained that, in her first prior meeting with the victim, she asked the victim's mother a number of questions relating to the victim's health. She said that, on the date of the assault, she took "an interval medical history [from the victim's mother] which is to ask about anything medical that had happened to [the victim] since the last time" Gladstone had taken such a medical history. Gladstone agreed with the prosecutor that each time she met with the victim, including the date of the assault, she had a conversation with the victim about the fact that Gladstone was a doctor for children. She further agreed that, on each occasion, the victim appeared to understand that she was talking to a doctor and why she was doing so.

Gladstone stated that after obtaining the interval medical history, she had the victim's mother leave the room so she could speak with the victim alone. She testified that the victim "sat on the exam table" and Gladstone asked her if there was "anything that [she] wanted to tell [Gladstone] about." She stated that the victim responded by telling Gladstone about four "physical things that had happened to her." Gladstone explained that the first thing the victim said was that the defendant "did this" and then "put her hand over her mouth." The victim also "pointed to a scratch on her arm and . . . said, 'The kitty did that.'" Gladstone stated further that the victim "had an IV in one of her hands, and she told [Gladstone] that the doctor tied her up with a blue rope and did that." Gladstone asked the victim if the "blue rope" was a "blue tourniquet on the table" in the room and the victim said "yes." Gladstone agreed with the prosecutor that the fourth thing the victim told her related to the nature of the victim's previous unrelated meetings with Gladstone. Gladstone described the victim as being "a pretty perceptive kid" and said that, on the day of the assault, she was "pretty talkative." Gladstone videotaped the child's injuries. Although at oral argument defense counsel stated that she believed Gladstone's interview of the victim was videotaped, that videotape, if it exists, is not part of the appellate record.

On appeal, the defendant argues that the trial court erred when it permitted Gladstone to testify regarding the victim's statement that the defendant "did this," and that when the victim said this, the victim put "her hand over her [own] mouth." The defendant contends that the victim's statement constituted inadmissible hearsay and was not subject to the exception under New Hampshire Rule of Evidence 803(4).

We accord the trial court considerable deference in determining the admissibility of evidence, and we will not disturb its decision absent an unsustainable exercise of discretion.  State v. Munroe, 161 N.H. 618, 626 (2011).  To demonstrate an unsustainable exercise of discretion, the defendant must show that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case.  Id.

"Hearsay is generally defined as an extrajudicial statement offered in court to show the truth of the matter asserted in the statement."  Id. (quotation omitted); N.H. R. Ev. 801(c).  Hearsay evidence is generally inadmissible, subject to certain well-delineated exceptions.  Munroe, 161 N.H. at 626; see N.H. R. Ev. 802.  One such exception, "Statements for Purposes of Medical Diagnosis or Treatment," applies to:

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment, regardless of to whom the statements are made, or when the statements are made, if the court, in its discretion, affirmatively finds that the proffered statements were made under circumstances indicating their trustworthiness.

N.H. R. Ev. 803(4).  The rationale for this exception is that statements made with a purpose of obtaining medical attention are usually made with the motivation to obtain an accurate diagnosis or proper treatment and, thus, they are inherently reliable because there is normally no incentive to fabricate.  Munroe, 161 N.H. at 626.

A three-part test must be met for evidence to be admissible under Rule 803(4).  Id. at 627.  First "a court must find that the declarant intended to make the statements to obtain a medical diagnosis or treatment."  Id. (quotation, brackets, and ellipsis omitted).  Second, "the statements must describe medical history, or symptoms, pain, sensations, or their cause or source to an extent reasonably pertinent to diagnosis or treatment."  Id. (quotation omitted).  Third, the court must find that the circumstances surrounding the statements support their trustworthiness.  Id.  Here, the defendant challenges the trial court's ruling with respect to the first and third parts of the test.

With respect to the intent requirement of part one, "we require extra care in determining the declarant's intent" when the declarant is a child.  State v. Letendre, 161 N.H. 370, 373 (2011) (quotation omitted).  This is because "it is difficult for a court to discover whether a young child completely understands the purpose for which information is being obtained from her."  Id. (quotation and brackets omitted).  Thus, the proponent of Rule 803(4) statements must

11

establish that the child had the requisite intent "by showing that the child made the statements understanding that they would further the diagnosis and possible treatment of her condition." Munroe, 161 N.H. at 627 (quotation and brackets omitted). Although the declarant's intent may be established by circumstantial evidence, we "will not assume, absent a record affirmatively establishing the proposition, that a young child possessed a sufficient treatment motive to allow her out-of-court statements to a physician to be introduced at trial." Id. at 628 (quotation omitted).

The defendant argues that there was no evidence to show that the victim understood that she was meeting with Gladstone for the purpose of medical diagnosis or treatment. Specifically, he contends that there was no evidence that the victim "connected the environment to a medical purpose" or that she "relayed the allegation against [the defendant] as being for the purpose of diagnosing or treating, or [being] even related to, her injuries." He further maintains that there was no evidence that Gladstone informed the victim that the information she was seeking "would help in the treatment of a medical problem." He argues that all of this is especially significant given that the victim was three years old when she made the statement regarding the defendant.

We conclude that the trial court's finding that the State had met its burden to demonstrate that the victim made the statement for medical diagnosis or treatment was not an unsustainable exercise of discretion. The record demonstrates that the victim's statement was made on the same day as the alleged assault. See id. (stating that "temporal proximity [between assault and examination] can indicate a declarant's statements were made for the purpose of seeking medical treatment"). As the trial court found, the statement was made in a hospital—"the most formal of medical settings"—after the victim had undergone "diagnostic tests up to and including a CAT scan." See id. (determining that victim's statements were made for the purpose of medical treatment or diagnosis, in part, because the examination was conducted "in a medical office, with all the equipment that a young child would recognize as indicative of a doctor's visit"). In addition, the victim had an existing doctor-patient relationship with Gladstone as she had met with her in Gladstone's medical office on two prior occasions in the previous six months. See State v. Graf, 143 N.H. 294, 304 (1999) (noting preexisting relationship between doctor and victim in analysis of whether victim made statements for purpose of medical diagnosis or treatment); cf. VanPatten v. State, 986 N.E.2d 255, 265 (Ind. 2013) (holding that there was insufficient evidence that alleged victim made statements to forensic nurse-examiner for purpose of medical diagnosis or treatment in part because there was no evidence regarding alleged victim's "past experience with medical facilities or medical providers").

The defendant argues that the fact that Gladstone did not tell the victim that the information she was seeking would help in the treatment of the victim

precludes a finding that the statement was made for medical treatment. Although a doctor's explanation that she is there to examine and treat any injuries of the declarant can support a finding that the declarant made a statement for the purpose of seeking medical treatment, see Letendre, 161 N.H. at 375, the fact that Gladstone did not specifically tell the victim that she was there to help with treatment is not dispositive of the issue of intent in this case. Here, Gladstone testified that she explained to the victim that she was a doctor for children and that the victim appeared to understand that she was talking to a doctor and why she was doing so. When Gladstone asked the victim a non-leading question regarding whether the victim had anything to tell her, the victim told Gladstone that the defendant "did this" and then the victim "put her hand over her [own] mouth," that the cat scratched her, and that she had been tied with a rope, which, when asked by Gladstone, the victim identified as being a tourniquet. As the trial court noted, all of the victim's responses related to her "injuries and their . . . alleged causes."

The defendant contends, however, that there was no evidence that Gladstone actually provided any treatment to the victim. We have explained that diagnosis need not inevitably result in treatment for statements to qualify under the rule; however, the diagnosis must have been sought with the purpose of treatment, if necessary. State v. Wade, 136 N.H. 750, 755 (1993). Thus, the statements must have been made for the purpose of "medical diagnosis or treatment, as opposed to solely for the purpose of enabling a physician to testify." Id. (quotation omitted). Gladstone's open-ended, non-leading question to the victim asking whether she had anything to tell Gladstone does not support a conclusion that the victim made the statements for the purpose of enabling Gladstone to testify. Rather, the circumstances were sufficient to permit an inference that the victim made the statement to Gladstone with the understanding that the doctor was examining her for a medical purpose. In light of all of the circumstances, it can reasonably be inferred that, notwithstanding the victim's young age, she understood that any statements she made to Gladstone were for the purpose of obtaining medical help. See Munroe, 161 N.H. at 628; see also State v. Diaz, No. 103878, 2016 WL 4480668, at *10 (Ohio Ct. App. Aug. 25, 2016) ("[I]t is unlikely that a 3-year-old child would believe that a nurse, in a medical setting such as a hospital, was examining her for any purpose other than for a medical evaluation."); State v. Gordon, 952 S.W.2d 817, 823 (Tenn. 1997) (concluding that, under totality of circumstances, three-year-old victim made statements to child psychologist at hospital for purpose of medical diagnosis and treatment).

The defendant further argues that there was no evidence that the victim "understood that what she was telling Gladstone needed to be truthful in order for her medical treatment to be effective." We disagree.

With regard to a child declarant, it is important that there be affirmative evidence of the child's understanding of the purpose for which information is

being obtained from her in order to preserve the trustworthiness guarantee inherent in Rule 803(4). Wade, 136 N.H. at 755. In Wade, the doctor testified only about her standard practice when initially seeing a patient and the importance of taking a medical history, thus shedding light on the doctor's motives, but not the victim's. Id. at 756. Here, Gladstone testified that she had a prior relationship with the victim concerning a separate medical issue and that she explained to the victim each time they met, including on the day of the assault, that she was a doctor for children. See State v. Lowe, 140 N.H. 271, 275 (1995) (holding that four-year-old child's presence in familiar location, where child had previously received medical care, supported trial court's finding that statements were reliable). She stated that the victim appeared to understand that she was talking to a doctor and why she was doing so. Further, the fact that the victim responded to Gladstone's open-ended, non-leading question with information relating solely to physical injuries and incidents supports the conclusion that the victim's response was reliable. We, therefore, conclude that the circumstances surrounding the statement at issue support the trial court's ruling that the statement was trustworthy. Accordingly, we hold that the trial court did not unsustainably exercise its discretion when it permitted Gladstone's testimony.

## II. State's Cross-appeal

The defendant was charged with three counts of second-degree assault. Each indictment alleged that the defendant "knowingly . . . caused bodily injury to [the victim] . . . specifically by causing non-accidental trauma . . . ." Each indictment then alleged a different injury: "by inflicting hemorrhaging in [the victim's] eyes," "by inflicting hemorrhaging in her face," and "by inflicting hemorrhaging in her chest." Before trial, the defendant moved to dismiss two of the three indictments, arguing that they violated double jeopardy principles because the injuries they alleged were caused by the same discrete act and, therefore, if convicted under multiple indictments, he would be subjected to multiple punishments for the same offense. The State objected.

Subsequently, the trial court issued an order concluding that "the appropriate units of prosecution for second degree assault are an act and a specific bodily injury" and, therefore, to support three convictions in this case, the State would "need to prove three actions and three bodily injuries." It explained, however, that it would "not dismiss the indictments at this juncture" because "there [was] insufficient evidence before [it] to determine how many 'acts' occurred causing the alleged injuries." In doing so, the court noted that "[t]he double jeopardy bar does not prevent a defendant from being tried on alternate theories of crimes—it merely prevents a person from being convicted of, and sentenced [for], multiple crimes for the same offense." Thus, the court denied the defendant's motion without prejudice to raise the double jeopardy argument after trial in the event that he was convicted under multiple indictments.

At the close of the evidence, the defendant requested a jury instruction on the lesser-included offense of simple assault, which the court granted. The jury acquitted the defendant of the second degree assault charges and convicted him of the simple assault charges. Following the verdict, the court stated that it would issue an order regarding the defendant's double jeopardy claim, but that it considered there to be "one offense charged three different ways." The State objected, arguing that the defendant was convicted of three separate offenses and, therefore, his convictions did not violate double jeopardy principles under either the State or Federal Constitutions. The court issued an order dismissing two of the three simple assault convictions on the basis that "there was a single criminal act that caused three arguably disparate injuries." The court explained that "[t]he unit of prosecution for simple assault by means of recklessly causing bodily injury is an act that results in bodily injury of any type. Thus, a single act that causes two or more medically distinct 'injuries' (such as, for example a two handed push that causes two separate contusions) is a single offense." (Citation omitted.)

On appeal, the State argues that the trial court erred in dismissing two of the simple assault charges. Noting that "[t]he primary issue in the double jeopardy challenge was the appropriate unit of prosecution," the State contends that the unit of prosecution for simple assault is "each individual injury that the defendant recklessly caused, even if the injuries were caused by only a single act." Because each indictment alleged a discrete bodily injury, the State maintains that the defendant's convictions did not violate double jeopardy principles. The issue of double jeopardy presents a question of constitutional law and, therefore, our review is de novo. State v. Fischer, 165 N.H. 706, 715 (2013).

Part I, Article 16 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution protect a defendant from being punished twice for the same offense. N.H. CONST. pt. I, art. 16; U.S. CONST. amends. V, XIV.

> Multiple punishment cases come in two varieties. First, there are the so-called "double-description" cases, in which the issue is whether two statutes describe two separate offenses or are merely different descriptions of the same offense. Second, there are "unit of prosecution" cases in which the problem is not that the same course of conduct is proscribed by more than one statute but that a defendant's continuing course of conduct is fragmented into more than one violation of a single statutory provision.

State v. Ramsey, 166 N.H. 45, 51 (2014) (quotations, ellipsis, citations, and brackets omitted). The parties agree that this case is of the second variety.

15

We recently recognized that, although we have consistently articulated the test to be used in a double jeopardy analysis under our State Constitution, we have not consistently applied the test. State v. Locke, 166 N.H. 344, 351 (2014).

> Our test, which we have referred to as the 'same evidence' test, provides: Two offenses will be considered the same for double jeopardy purposes unless each requires proof of an element that the other does not. We focus upon whether proof of the elements of the crimes as charged will in actuality require a difference in evidence.

Id. (quotation omitted). Because we have applied this test inconsistently and because we have expressed doubt that our double jeopardy law can be reconciled, we invited "parties in future cases to ask us to reconsider our double jeopardy jurisprudence consistent with the principles of stare decisis and to suggest a formulation of the double jeopardy test to be applied under our State Constitution." Id. at 353 (citation omitted).

The parties here have not asked us to reconsider our double jeopardy jurisprudence. Although in its brief the State applies the "same evidence" test, it also utilizes a statutory interpretation analysis, looking to the legislature's intent as expressed in the words of the simple assault statute to determine the proper unit of prosecution in this case. At oral argument, the State further recognized that a unit of prosecution analysis involves looking to the language of the statute to determine the legislature's intent.

Analyzing the legislature's intent to determine the proper unit of prosecution is an inquiry that we have often utilized when addressing a federal double jeopardy challenge. See State v. Cobb, 143 N.H. 638, 647 (1999) (explaining that under the United States Constitution's Double Jeopardy Clause "determination of the proper unit of prosecution is a function of the legislature's intent" (quotation and brackets omitted)); State v. Stratton, 132 N.H. 451, 455 (1989) (noting that "our review of the defendant's double jeopardy claim under the United States Constitution requires us to consider the legislature's articulated intent"). This is also the inquiry that the trial court utilized in its pre-trial order, stating that it would "look to the language of the applicable statute to determine the proper unit of prosecution." (Quotation and brackets omitted.) In its post-trial order, the court cited its first order in concluding that "[t]he unit of prosecution for simple assault by means of recklessly causing bodily injury is an act that results in bodily injury of any type." On appeal, the State does not appear to challenge the trial court's use of this inquiry. To the extent that the State believes the trial court improperly used this inquiry, it was incumbent upon the State to move for reconsideration. See State v. Mouser, 168 N.H. 19, 27 (2015). Because the appellate record does not demonstrate that the State challenged the trial court's use of this

16

inquiry, we will use it in addressing the State's argument that the trial court erred in determining the proper unit of prosecution for simple assault.

Thus, in determining whether a defendant is subject to multiple punishments for the same offense, we must determine the unit of prosecution intended by the legislature. State v. Jennings, 155 N.H. 768, 777 (2007). "When a statutory provision is ambiguous, the rule of lenity demands that all doubt be resolved against turning a single transaction into multiple offenses and thereby expanding the statutory penalty." Id. However, the rule of lenity "is applicable only where statutory ambiguity has been found. Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one." Id. (quotation omitted). We review the plain language of the simple assault statute to discern the legislature's intent. See id. We construe provisions of the Criminal Code "according to the fair import of their terms and to promote justice." RSA 625:3 (2016).

The simple assault statute provides, in pertinent part, that "[a] person is guilty of simple assault if he . . . [r]ecklessly causes bodily injury to another." RSA 631:2-a, I(b). The State does not dispute that the defendant's simple assault convictions stemmed from only one act. Nonetheless, the State contends that this is immaterial because the statutory language demonstrates that the legislature intended "to make the unit of prosecution each individual injury that the defendant recklessly caused, even if the injuries were caused by only a single act." We disagree.

The plain language of the statute establishes that the legislature has criminalized the act of recklessly causing bodily injury—not each individual injury. Cf. State v. Greene, 137 N.H. 126, 128 (1993) (explaining that the elements of knowing simple assault are twofold: "the culpable mental state of knowingly and the proscribed conduct of unprivileged physical contact"). Nothing in the language of the statute suggests that the legislature intended to allow multiple punishments "for a single criminal act against a single victim, simply because the act results in multiple injuries." Com. v. Traylor, 34 N.E.3d 276, 284, 284-86 (Mass. 2015) (holding that unit of prosecution for statute prohibiting assault and battery upon a child was not injuries resulting from proscribed conduct). Accordingly, we hold that the legislature intended for the unit of prosecution under RSA 631:2-a, I(b) to be each individual act of causing bodily injury to another. We, therefore, conclude that the trial court did not err when it dismissed two of the three simple assault convictions.

Finally, any issues raised in the defendant's notice of appeal that he has not briefed are deemed waived. See State v. Blackmer, 149 N.H. 47, 49 (2003).

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.