**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2023-0257, <u>State of New Hampshire v. Anderson Pereira</u>, the court on March 18, 2025, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the parties' oral arguments, and has determined to resolve the case by way of this order. <u>See</u> <u>Sup. Ct. R.</u> 20(3). The defendant, Anderson Pereira, appeals his conviction, following a jury trial in the Superior Court (<u>Delker</u>, J.), for first degree murder. <u>See</u> RSA 630:1-a, I(a) (Supp. 2024). He argues that the trial court erred by: (1) denying his motion to suppress statements made in a custodial interrogation; (2) ruling that a statement made by an "alternative perpetrator" constituted inadmissible hearsay; and (3) failing to strike expert testimony relevant to the alibi of the proposed "alternate perpetrator." We conclude that the trial court did not err in denying the defendant's motion to suppress statements made during a custodial interrogation. We also conclude that any errors associated with the trial court's evidentiary rulings were harmless beyond a reasonable doubt. Accordingly, we affirm.

I.    <u>Facts</u>

The jury could have found the following facts. In 2019, Flavia de Oliveira lived with the defendant in an apartment in Methuen, Massachusetts. She and the defendant were in a long-term relationship. Later that year, de Oliveira began communicating with the victim via Facebook and text. In November 2019, after meeting the victim only a few times, she moved to the victim's home in Manchester. Soon after, she and the victim married. In January 2020, de Oliveira's son, Gabriel Baronto, came to the victim's house for a long-term visit.

On March 7, an argument broke out between Baronto and the victim.[1] Baronto threatened to punch the victim in the face, and the victim ultimately ordered Baronto to leave his house. Baronto and de Oliveira left and returned to the defendant's apartment. Subsequently, Baronto sent the victim Facebook messages that stated: "I'm going to give you the beating you deserve" and "I will block you."

---

[1] Gabriel Baronto speaks only Portuguese. During the argument, Baronto and the victim communicated by using Google Translate.

During the following week, de Oliveira alternated between staying at the victim's house and the defendant's apartment. On the morning of March 12, de Oliveira and the victim discussed whether the victim was willing to allow Baronto to return to his house and the victim's concerns that he "did not want [de Oliveira] spending time with the [d]efendant." Later that day, de Oliveira returned to the defendant's apartment.

She and Baronto remained at the defendant's apartment throughout the evening of March 12 and into the morning of March 13. The defendant, however, did not spend the evening at the apartment. Instead, he worked at a nearby restaurant from approximately 2:00 p.m. to 9:30 p.m. He did not return to the apartment after his shift ended.

At approximately 11:00 p.m., surveillance footage captured a vehicle entering the victim's neighborhood. The vehicle dropped off an individual, whom investigators believed to be the assailant. The footage showed him walking toward the victim's house. About two hours later, the defendant drove a box truck, used by the victim for work, from the victim's home to a parking lot in Methuen. The defendant parked the box truck in a parking lot, then walked back to his apartment. Throughout the evening, cell location data identified the defendant's phone traveling together with the victim's phone and smartwatch.

During the afternoon of March 13, the defendant returned to the parking lot, purchased a shovel from a nearby hardware store, and then went to work. Later that night, he went to the location in Methuen where investigators eventually discovered the victim's body, and then to another site where the victim's box truck was later discovered. There, the defendant exited the box truck, discarded some items, and left in an Uber.

On March 14, the victim's family became concerned after he failed to appear for work. They tracked his smartwatch and discovered the victim's box truck parked next to a dumpster. Thereafter, law enforcement opened a missing person investigation. They subsequently discovered clothing and a smartwatch in a nearby dumpster and found blood stains on the interior of the truck. Months later, law enforcement discovered the victim's body at the Methuen location that the defendant visited during the night of March 13.

The defendant was later arrested in Florida in connection with the victim's murder. In October 2021, New Hampshire law enforcement interviewed the defendant. The investigators began the interview by reading the defendant his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). The defendant responded that he understood the rights, discussed the implications of waiving them, and thereafter signed the waiver form. Subsequently, the defendant was charged with, among other things, first degree murder. See RSA 630:1-a, I(a).

Prior to trial, the defendant moved to suppress "[a]ll statements" made after he "expressly invoked [his Miranda] rights" by saying "[n]o, I don't want to waive" during the October 2021 interview. The defendant argued that the detectives violated the New Hampshire and United States "Constitutions when they did not cease all questioning as soon as [the defendant] unambiguously invoked his rights." (Emphasis and capitalization omitted). The State objected, asserting that the defendant's statements were not unambiguous assertions of his constitutional rights. The trial court held evidentiary hearings on November 4 and December 8, 2022. The State subsequently filed a post-hearing memorandum in support of its objection to the defendant's motion. After reviewing the transcript and audio and video recording of the interrogation, the trial court denied the defendant's motion to suppress, concluding that "the defendant's purported invocation was ambiguous."

The State and the defendant also filed pre-trial motions in limine related to the admissibility of evidence that an alternative perpetrator murdered the victim. In its February and March 2022 motions, the State sought, inter alia, to "preclude . . . statements made by Gabriel Baronto through voice mail and text messages" and "details of an argument between the victim and Baronto that resulted in the victim removing Baronto from the victim's home in Manchester." The defendant objected and moved in limine to be allowed to introduce evidence that an alternative perpetrator committed the murder.

On January 6, 2023, the trial court issued an order ruling on all the pre-trial motions in limine. As relevant here, the trial court denied the State's motion to exclude evidence of Baronto's argument with the victim and granted, in part, the defendant's motion, ruling that "to the extent the defendant asserts that Baronto is the alternative perpetrator, his threats against the victim just days before the victim disappeared [are] relevant to establish intent and motive." The trial court also denied the State's motion to exclude text message and voicemail statements between Baronto and the victim for the same reasons.

At the beginning of the defendant's case, the State argued that some portions of Baronto's messages included in the State's and defendant's exhibits were inadmissible because certain phrases constituted hearsay and did not fall under a hearsay exception. The trial court ruled that a portion of the messages, including Baronto's statement to the victim that said, "'[y]ou stay there saying bad things to my mother, but you are forgetting a simple fact. I am not the same as she who forgives the other,'" constituted inadmissible hearsay. The defendant asked the court to reconsider its ruling, contending that the statement constituted a threat. The trial court declined, responding that the statement was also inadmissible under New Hampshire Rule of Evidence 403 and concluding that the unfair prejudice caused by its admission outweighed its probative value.

3

As part of its case, the State introduced evidence that Baronto remained at the defendant's apartment on March 12 and into the morning of March 13 watching the television show "Stranger Things."  To establish Baronto's alibi in order to disprove the defendant's alternative perpetrator theory, the State introduced a forensic audio expert.  The expert testified that three recordings, recovered from Baronto's phone and made between midnight and 1 a.m. on March 13, contained audio from "Stranger Things" in the background.  On cross-examination, the defendant asked a line of questions about whether the "Stranger Things" audio could be picked up through a phone call rather than from a television in the same room as the phone that made the recording.

On redirect, the State asked the expert to clarify whether he agreed with this hypothesis, to which the expert responded, "No, not at all."  The defendant objected and moved to strike the State's question and the expert's answer, arguing that the expert's response constituted an undisclosed opinion and that the requisite foundation to offer the opinion was lacking.  The court overruled the defendant's objection and declined to strike the testimony.

At the conclusion of the 14-day jury trial, the jury found the defendant guilty of first degree murder.  RSA 630:1-a, I(a).  This appeal followed.

## II.    Analysis

On appeal, the defendant argues that the trial court erred by denying his motion to suppress statements made after he allegedly invoked his privilege against self-incrimination under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.  See Miranda, 384 U.S. at 478-79.  Specifically, the defendant contends that his statement, "[n]o, I don't want to waive," was "clear and unambiguous" and constituted an unequivocal invocation pursuant to Miranda.  The State disagrees, arguing that the trial court correctly denied the motion to suppress because "no unambiguous invocation occurred" and that "the totality of the circumstances . . . reflected possible confusion on [the defendant's] part."  We agree with the State.

We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).  The New Hampshire Constitution guarantees a criminal defendant protection from compelled self-incrimination.  State v. Watson, 170 N.H. 720, 724 (2018).  Although neither the Federal nor the State Constitution requires "any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation," the United States Supreme Court and this court have developed rules for safeguarding that privilege.  Id. (quotation omitted).  Thus, when a person is taken into custody or deprived of his freedom in any significant way, prior to interrogating him, the police must tell him that he has the right to remain silent, that anything he says can and

4

will be used against him, and that he has the right to counsel.  Id. (quotation omitted); see Miranda, 384 U.S. at 467-73.  Before a defendant's responses made during a custodial interrogation may be used against him, the State must prove, beyond a reasonable doubt, that the interrogation did not violate his constitutional rights under Miranda.  State v. Lynch, 169 N.H. 689, 693 (2017).

In Miranda, the Supreme Court held that, if an accused is in police custody, has been informed of his rights, and "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Lynch, 169 N.H. at 693 (quotation omitted); State v. Laurie, 135 N.H. 438, 442 (1992) (deciding under the State Constitution that whenever a suspect in custody exercises his option to cut off questioning, the police must scrupulously honor that request).  Although we review a trial court's findings concerning which words a defendant used to invoke his Miranda rights under the clearly erroneous standard, whether the defendant's words constitute an invocation of his rights is a question of law, which we review de novo.  Lynch, 169 N.H. at 693.

To invoke his Miranda rights, the accused must do so unambiguously.  Watson, 170 N.H. at 727.  To determine whether the defendant successfully invoked his Miranda rights, we examine his statements under the totality of the circumstances.  Lynch, 169 N.H. at 693.  Under this inquiry, the question is whether a reasonable officer, in light of the totality of the circumstances, would understand the statement as an invocation.  Id. at 694-95.  If a statement is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that a suspect might be invoking" his Miranda rights, precedent "does not require the cessation of questioning."  Id. (quotations omitted).  Although responses subsequent to the defendant's request may not be used to cast retrospective doubt on the clarity of the initial request itself, the court may consider whether the circumstances preceding the alleged invocation render the statement ambiguous.  Smith v. Illinois, 469 U.S. 91, 98, 100 (1984).  "When a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not" the accused intended to invoke his Miranda rights.  Lynch, 169 N.H. at 694-95 (quotation omitted).

The defendant maintains that he unambiguously invoked his Miranda rights to counsel and silence during a custodial interrogation by saying: "No, I don't want to waive."  At the outset of the interrogation, the detective reviewed the Manchester Police Department's standard form setting forth the defendant's Miranda rights.  The detective read to the defendant each right, one at a time.  Every time the detective read a right, the defendant then initialed the form to acknowledge that he understood the right, in accordance with the detective's instructions.  Then, the following exchange occurred:

5

[Detective]: "are you willing to waive each of these rights and answer questions?"
[Defendant, tilting his head to the side]: "If I wanted to waive?"
[Detective]: "Yes."
[Defendant]: "No, I don't want to waive."

The trial court reasoned that it could not review these statements in isolation but "must consider them in the context of the interrogation as a whole." See State v. Jeleniewski, 147 N. H. 462, 467 (2002). The court found that the video and audio recording of the interrogation "provides the Court with that needed context." Based on its review of this evidence, the trial court found that "[a]t this juncture, the defendant's demeanor and his words indicated to a reasonable police officer that the defendant may be confused about what the officer just asked him."

Upon conducting a de novo review of the same evidence considered by the trial court, we reach the same conclusion. Specifically, the defendant's tilt of his head, hesitation, and follow-up question signaled confusion as to the meaning of the term "waive" that rendered his subsequent statement, "[n]o, I don't want to waive," ambiguous to a reasonable officer. This is particularly true in light of both the detective's earlier instruction to the defendant to initial the form if he understood the statement and the defendant's response to this instruction by promptly initialing next to each right. Here, the defendant's hesitation to initial the form and his clarifying question cast doubt as to whether the defendant understood the previous statement, and whether he intended to invoke his Miranda rights with his response. Accordingly, the trial court correctly concluded that the "demeanor of both participants, the timing and pace of their exchange, and the content of the dialogue establish that" the defendant's statement, "[n]o, I don't want to waive," did not unambiguously invoke his Miranda rights. Therefore, we conclude that the trial court did not err in denying the defendant's motion to suppress his statements. Because the Federal Constitution affords the defendant no greater protection than the State Constitution under these circumstances, we reach the same result under the Federal Constitution as we do under the State Constitution. Watson, 170 N.H. at 727.

Next, the defendant challenges two of the trial court's evidentiary rulings. First, the defendant argues that the trial court erred by overruling his objection and failing to strike a portion of the State's expert testimony related to the defendant's alternative perpetrator theory. Second, the defendant argues that the trial court unsustainably exercised its discretion by ruling that part of one of the messages that Baronto sent to the victim constituted inadmissible hearsay. The State counters that the trial court ruling was not an unsustainable exercise of discretion because the excluded portion of the text message was not a threat; rather it constituted an inadmissible hearsay statement offered for the truth of the matter asserted. The State also argues

6

that any errors associated with the trial court's evidentiary rulings were harmless beyond a reasonable doubt.  We need not determine whether the trial court erred, because we agree with the State that any errors associated with the trial court's rulings were harmless beyond a reasonable doubt.  Our review of the record reveals that the admission of the expert's testimony and the exclusion of the portion of Baronto's message to the victim were cumulative or inconsequential in relation to the strength of the State's case, particularly in view of the overwhelming nature of the alternative evidence of the defendant's guilt.

To establish harmless error, the State must prove beyond a reasonable doubt that the error did not affect the verdict.  State v. Boudreau, 176 N.H. 1, 11 (2023).  This standard applies to both the erroneous admission and exclusion of evidence.  Id.  We consider the alternative evidence presented at trial as well as the character of the erroneously admitted or excluded evidence itself.  Id.  To determine whether the State has proven beyond a reasonable doubt that an error did not affect the verdict, we must evaluate the totality of circumstances at trial.  Id. at 11-12.

The factors that we have considered in assessing whether an error did not affect the verdict include, but are not limited to: (1) the strength of the State's case; (2) whether the admitted or excluded evidence is cumulative or inconsequential in relation to the strength of the State's case; (3) the frequency of the error; (4) the presence or absence of evidence corroborating or contradicting the erroneously admitted or excluded evidence; (5) the nature of the defense; (6) the circumstances in which the evidence was introduced at trial; (7) whether the court took any curative steps; (8) whether the evidence is of an inflammatory nature; and (9) whether the other evidence of the defendant's guilt is of an overwhelming nature.  Id.  No one factor is dispositive. Id.

First, we address whether the defense counsel's initial solicitation of the expert's opinion on cross-examination rendered the expert's redirect testimony on the same point cumulative.  At trial, the State's expert witness testified about the background sounds in audio recordings recovered from Baronto's phone that were made during the early morning of March 13.  The expert testified that he prepared a report for the State, in which he concluded that the "background audio was identified as belonging to season 1 episodes 4 and 5 of the show" "Stranger Things."  The expert's conclusion corroborated de Oliveira's testimony that she and Baronto watched "Stranger Things" at the defendant's apartment on the evening of March 12 and into the early morning on March 13.  Additionally, the defendant's Netflix records confirmed that "Stranger Things" played from his account during the same period of time.

On cross-examination, the defense questioned the State's expert regarding the possibility that the recordings from Baronto's phone picked up

audio from "Stranger Things" through a speaker phone conversation rather than from a television. The following exchanges between the defendant's counsel and the State's expert took place:

> [Defendant]: [Y]ou were not asked to determine [whether] that background noise [was] actually coming from a TV in the same room as the person on the phone?
> [Expert]: Well, it would have to be.

The defendant followed up by asking this hypothetical:

> [Defendant]: [I]f my teenager daughter walked in [the room] . . . [and] she has a live video feed going to her friend, if I happened to be watching Stranger Things, the friend might hear that audio, right, in the . . . background?
> [Expert]: It would be very difficult to hear coming through a phone speaker . . . it would be so minute that I don't think it would be recorded.

Subsequently, the defendant asked the expert:

> [Defendant]: So if you have your phone, and you're chatting with your brother in Germany . . . and both of you are doing a video call so that . . . you're using speaker phones, then don't you think that if your brother happens to be watching Stranger Things, that you might hear it on your end in the background?
> [Expert]: Yeah, but I don't think it would have the same . . . residual frequencies that were picked up on the recording.

On redirect examination, the State asked the expert:

> [State]: But even though you weren't asked to do that, do you agree with his hypothesis?
> [Expert]: No, not at all.

The defendant objected, arguing that the expert's redirect testimony constituted an undisclosed opinion and that the State did not establish an adequate foundation to offer the testimony. He subsequently moved to strike the State's question and the expert's answer. The State responded that the defense elicited the expert's opinion during cross-examination. The trial court agreed with the State and overruled the objection.

On appeal, the State correctly observes that the defendant initially solicited during cross-examination the expert's opinion about the possibility that the audio recordings did not capture the "Stranger Things" audio from a television located in the same room as Baronto. After establishing that its theory was beyond the scope of the expert's report, the defense proposed its

hypothesis and did not object to the expert's responses. On redirect examination, the State asked the expert to clarify whether or not he agreed with the theory. Accordingly the expert's testimony on redirect examination was cumulative because the defendant previously solicited the expert's opinion on the matter three times and did not move to strike that opinion when the expert initially disagreed.

Next, we address whether the portion of Baronto's message to the victim that the trial court excluded is also cumulative. The statement, in relevant part, said: "You stay there saying bad things to my mother, but you are forgetting a simple fact. I am not the same as [my mother] who forgives the other." The trial court ruled that this statement constituted inadmissible hearsay because the message described something that happened in the past and constituted a statement of fact offered for the truth of the matter asserted.

However, the defendant introduced other similar statements that threatened physical harm to the victim that were not excluded as inadmissible hearsay. The jury heard testimony at trial that Baronto sent messages to the victim saying, "I'm going to give you the beating you deserve" and "I will block you." The jury also heard testimony that Baronto told the victim during an argument that he would "beat him up" and would "punch him in . . . his face." Additionally, another witness testified that she overheard Baronto threaten the victim, saying: "wait until you see what I'm going to do with your good side of your face." In light of the testimony about these similar threats that Baronto made against the victim, the excluded portion of the message is cumulative.

Finally, we address the strength of the State's case. At trial, the State introduced ample evidence that would allow the jury to reasonably conclude that Baronto had an alibi the night of the victim's disappearance. Specifically, the State introduced testimony, cell phone records, photos, and video evidence showing that Baronto remained at the defendant's apartment on the night of the victim's disappearance.

Additionally, the alternative evidence of the defendant's guilt was overwhelming. See id. Surveillance footage and cell phone location data from the night that the victim disappeared placed the defendant and the victim in the same locations. Video footage captured an individual — believed to be the primary suspect — exiting a vehicle in the victim's neighborhood and walking toward the victim's house the night he disappeared. Around 1:15 a.m. on March 13, the victim's box truck exited the neighborhood.

Thereafter, cell phone and smartwatch location data and records indicated that the defendant and the victim traveled southbound on the highway toward Salem, to Methuen, and then to a parking lot. Next, the defendant's cell phone records showed that he left the parking lot and traveled to his apartment. The following day, surveillance footage and location records

and data from the defendant's cell phone established that he returned to the parking lot, purchased a shovel from a nearby hardware store, visited the site where investigators later discovered the victim's body, and abandoned the victim's box truck.

The State also introduced evidence establishing that the defendant fled the week after the victim's disappearance. Five days after the victim's disappearance, investigators interviewed the defendant. The next day the defendant left his apartment and never returned. He stopped going to work, without any explanation, and, over the subsequent week, he began emptying his bank accounts. These withdrawals began in Massachusetts and ended in Florida. Thereafter, all his banking activity stopped.

Accordingly, the alternative evidence of the defendant's guilt was overwhelming, and the State expert's statement and the portion of Baronto's message to the victim were cumulative and plainly inconsequential in relation to the strength of the State's case. Therefore, we conclude that, based upon the totality of the circumstances, any error that the trial court made by admitting the expert's testimony on redirect examination and excluding a portion of Baronto's message to the victim did not affect the verdict and thus was harmless beyond a reasonable doubt.

<u>Affirmed</u>.

BASSETT, DONOVAN, and COUNTWAY, JJ., concurred.

**Timothy A. Gudas,**
**Clerk**